UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony J. GIACALONE,
Defendant-Appellant.

No. 77–5074.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 14, 1977.

Decided April 7, 1978.

Rehearing and Rehearing En Banc
Denied May 19, 1978.

330

Joseph F. Dillon, Raymond, Fletcher, Dillon & Titcomb, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., Geoffrey A. Anderson and Richard E. Zuckerman, U. S. Dept. of Justice, Detroit, Mich., for plaintiff-appellee.

Before LIVELY, ENGEL and MERRITT, Circuit Judges.

LIVELY, Circuit Judge.

The defendant appeals his jury conviction for income tax evasion. The indictment charged violation of 26 U.S.C. § 7201[1] with respect to taxes due for the years 1968, 1969, 1970 and 1971. The jury returned guilty verdicts for the first three years but found the defendant not guilty with respect to 1971.

 The defendant filed joint income tax returns with his wife and paid the taxes which the returns indicated were due. The government charged that the defendant understated his taxable income by substantial amounts in each of the indictment years. The government's evidence consisted primarily of a recomputation of the defendant's taxable income by "the net worth plus nondeductible expenditures method." (Government summary witness Robert Campbell, Tr. 9635). Under this method the government seeks to compute taxable income by determining a taxpayer's net worth (excess of assets at cost over liabilities) at the end of each year plus his nondeductible expenditures during the year. The difference between this figure and the net worth at the beginning of the year is treated as the taxable income received during the year. The government must show that it has ruled out the existence of nontaxable funds as the source of expenditures or increases in net worth. See *United States v. Taglianetti*, 398 F.2d 558, 562 (1st Cir. 1968), *aff'd*, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 303 (1969); *United States v. Goichman*, 407 F.Supp. 980, 986 (E.D.Pa.), *aff'd*,

---

1. **§ 7201. Attempt to evade or defeat tax**

 Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

547 F.2d 778 (3d Cir. 1976). The net worth method was approved by the Supreme Court for use in income tax prosecutions in *Holland v. United States*, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and in three other cases decided the same day: *Friedberg v. United States*, 348 U.S. 142, 75 S.Ct. 138, 99 L.Ed. 188; *Smith v. United States*, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192; *United States v. Calderon*, 348 U.S. 160, 75 S.Ct. 186, 99 L.Ed. 202.

The defendant raises numerous issues on appeal. We will discuss separately those which appear to be the most substantial.

## SUFFICIENCY OF THE EVIDENCE

### A. Accuracy of the Opening Net Worth Figure

The defendant has contended throughout that the government's evidence was not sufficient to sustain the verdict because it failed to establish the "opening net worth" with sufficient certainty. In *Holland* the Supreme Court wrote that "an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases in the taxpayer's assets." 348 U.S. at 132, 75 S.Ct. at 134. A net worth statement prepared by government agents was received in evidence as exhibit # 3517. The itemization of the defendant's opening net worth—*i. e.*, net worth on December 31, 1967, the last day before commencement of the indictment years—on the government's statement contained no dollar amount for cash. "Cash" was shown as an item, but was represented by a dash, and this representation was repeated for each year through 1971. Page 1 of exhibit # 3517, reproduced below, shows the use of dashes:

ANTHONY GIACALONE
COMPUTATION OF INCOME BY THE NET WORTH
PLUS NON-DEDUCTIBLE EXPENDITURES METHOD

| | 12/31/67 | 12/31/68 | 12/31/69 | 12/31/70 | 12/31/71 | SCHEDULE |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash On Hand | — | — | — | — | — | |
| Checks on hand | 3,503.00 | 2,600.00 | 3,330.00 | 3,330.00 | 1,747.13 | A |
| Bank accounts | 13,116.43 | 53,638.02 | 9,006.08 | 8,149.78 | 275,134.58 | B |
| Receivables | 31,918.81 | 25,234.85 | 24,072.12 | 20,412.75 | 85,295.04 | C |
| Securities | 297,874.38 | 449,585.98 | 538,355.61 | 637,663.35 | 482,945.50 | D |
| Property | 81,658.65 | 81,658.65 | 81,658.65 | 81,658.65 | 100,658.65 | E |
| Automobiles | 11,869.53 | 14,370.00 | 20,720.33 | 20,720.33 | 33,078.83 | F |
| Household furnishings | 26,595.37 | 26,865.87 | 26,865.87 | 26,865.87 | 26,964.15 | G |
| Furs | 1,990.00 | 3,180.00 | 3,180.00 | 3,180.00 | 3,180.00 | G |
| Horses | 5,000.00 | 3,500.00 | 4,000.00 | 4,000.00 | 4,000.00 | H |
| Other assets | 1,706.00 | 17,506.00 | 15,800.00 | 15,800.00 | 98,125.53 | J |
| Total Assets | 475,232.17 | 678,139.37 | 726,988.66 | 821,780.73 | 1,111,129.41 | |
| **LIABILITIES** | | | | | | |
| Loans payable | 226,277.83 | 424,864.00 | 457,500.79 | 501,422.23 | 351,288.48 | K |
| Total Liabilites | 226,277.83 | 424,864.00 | 457,500.79 | 501,422.23 | 351,288.48 | |

The defendant argues that since the dashes added nothing to the totals they must be treated as zeroes. He points out that the government's evidence showed numerous cash purchases by the defendant and his wife, thus proving the existence of cash. Since no cash was shown on the statement, it cannot reflect accurately or with "reasonable certainty" the opening net worth figure for each year, he contends. This argument is fallacious. The entire thrust of the case was that the cash expenditures in each of the prosecution years were made from current taxable income

received in that year, not from cash on hand at the beginning of the year. The government witness Campbell conceded that the defendant possessed some cash, but testified that the dashes represented an unknown, presumably constant amount and were similar to "$\times$" in an algebraic equation. The defendant is a "professional gambler" (appellant's reply brief, pp. 4 & 42). Campbell testified that the net worth statement assumed the existence of a "bankroll" of cash which remained approximately the same throughout the period covered. However, he asserted that as a constant it did not affect the accuracy of the net worth statement.

The defendant presented evidence that he had $300,000 in cash on December 31, 1967 and that this fund was consumed at the rate of $50,000 per year thereafter. According to defendant's computations these funds approximately accounted for his increased net worth year by year. In anticipation of this defense the government presented a detailed analysis of the financial transactions of the defendant and his wife from October 17, 1951 through December 31, 1967. The analysis purported to show that during this 16-year period the Giacalones had spent approximately $81,000 more than was available to them according to their income tax returns. October 17, 1951 was chosen as the starting point for the cash analysis because the defendant gave a statement to an agent of the Internal Revenue Service on that date in which he detailed all his assets and liabilities. The government argues that this evidence of a negative cash position on December 31, 1967 was sufficient to justify the jury in finding that no cash hoard of $300,000 existed, as claimed by the defendant, and was sufficient to support the omission of any cash other than the unknown quantity representing the gambler's bankroll, shown by dashes, from the net worth statement.

■ Because of the danger of miscarriage of justice inherent in net worth prosecutions, we review each such case with great care. See *Holland v. United States, supra*, 348 U.S. at 129, 75 S.Ct. 127. The burden of proof is no different than in any other criminal case—the government must prove all material elements of the offense beyond a reasonable doubt. However, in these cases the evidence of guilt is largely circumstantial, and the net worth method is, at best, only an approximation. As an added measure of protection the government is required to demonstrate that it has investigated the existence of sources of net worth other than unreported taxable income. As the Supreme Court said in *Holland*, ". . . the cogency of its proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt." 348 U.S. at 135, 75 S.Ct. at 135. Evidence which carefully traces the financial history of a defendant and discloses expenditures in excess of reported resources in the period immediately preceding the indictment years is sufficient to support a finding that there was no cash hoard. *Friedberg v. United States, supra*, 348 U.S. at 144, 75 S.Ct. 138.

■ The defendant did not claim that he had nontaxable sources of income during the indictment years. Instead, he relied upon witnesses who testified that the $300,000 cash hoard came from the defendant's father prior to that time. The government presented proof that the father had serious financial problems during the period it was claimed the gift money was being accumulated and that he left no probate estate. The evidence was clearly sufficient to support an inference that the defendant's father was not the source of funds which explain the increased net worth and expenditures of the defendant and his wife. See *McGarry v. United States*, 388 F.2d 862 (1st Cir. 1967), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1178, 22 L.Ed.2d 455 (1969).

■ Though we have found no case precisely on point we conclude that the use of dashes did not invalidate the net worth statement. The Supreme Court held in *United States v. Johnson*, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943), that the government is not required to produce proof of the exact amount of unreported income of a large-scale gambler. The na-

ture of the activities of a professional gambler virtually precludes such precision. The effect of using the dashes is no different from the use of zeroes approved in *United States v. Goichman, supra.* It avoids the untenable assumption that a professional gambler could operate without any cash. The recognition of a cash bankroll treated as a constant, together with proof which would support a finding that no significant cash hoard existed, was a sufficient accounting for cash in the opening net worth computation.

### B. Use of a Joint Net Worth Statement

■ The defendant also claims that the evidence was insufficient because the government used a joint net worth statement for the defendant and his wife. The defendant and his wife filed joint returns for the four years covered by the indictment and Mrs. Giacalone's occupation was listed on the returns as "housekeeper." The accountant who prepared the returns testified that all the information and figures for the returns were supplied by the defendant. Though the defendant presented evidence that his wife had a separate estate, or net worth, the government produced Social Security records which indicated that Mrs. Giacalone had no earned income between 1937 and 1971. Furthermore, the government proof traced a number of nondeductible expenditures by the wife to funds furnished by defendant. The jury was not required to believe the evidence that some of the expenditures were made from the separate estate of defendant's wife.

The district court did not commit error in holding that the use of a joint net worth statement was sufficient under the facts of this case. By filing joint returns the defendant and his wife recognized a single taxable unit. *Robert A. Coerver,* 36 T.C. 252 (1961), *aff'd per curiam,* 297 F.2d 837 (3d Cir. 1962); *Furnish v. C. I. R.,* 262 F.2d 727 (9th Cir. 1968); *cf.* 8A Mertens Law of Federal Income Taxation § 47.10 (rev. 1971). The evidence was impressive that the defendant personally controlled and

handled the finances, and he alone was charged with attempting to evade taxes owed by the taxable unit. Although Mrs. Giacalone was not charged with the criminal offense, her financial transactions were intertwined with those of her husband. As in *United States v. Costello,* 221 F.2d 668, 674 (2d Cir. 1955), *aff'd,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), the evidence was sufficient to permit the government to treat expenditures by Mrs. Giacalone as having been made with her husband's money.

■ On the entire record we conclude that there was sufficient evidence to support the jury's verdict of income tax evasion for the years 1968, 1969 and 1970. *Holland v. United States, supra; United States v. Newman,* 468 F.2d 791 (5th Cir. 1972), *cert. denied,* 411 U.S. 905, 93 S.Ct. 1527, 36 L.Ed.2d 194 (1973); *McGarry v. United States, supra; United States v. Costello, supra; United States v. Goichman, supra.* When the government shows by competent evidence an increase in net worth together with nondeductible expenditures and identifies a "likely source" of unreported income—in this case, gambling—it has carried its burden of proof. *United States v. Costello, supra,* 221 F.2d at 672. The jury could infer willfulness from the evidence of a consistent pattern of understatement of income and proof which negated the existence of non-taxable sources of increased net worth.

### UNFAVORABLE PUBLICITY

#### A. Pre-trial Publicity

■ The defendant also urges reversal on the ground that his trial was tainted by a "saturation" of unfavorable pre-trial publicity in newspaper articles and television broadcasts in the Detroit area, and on several occasions, in the national media. Though little of the publicity related to the case which was to be tried, defendant argues that it placed him in a bad light with the jury. Particularly objectionable, he maintains, were news accounts linking him with the disappearance of James Hoffa, an event which occurred approximately ten

weeks before the commencement of the tax evasion trial. One month before the scheduled trial the district court denied a motion for a 120-day continuance based in part on extensive publicity. The defendant did not make a motion for change of venue.

Two weeks before the trial date the defendant submitted a list of six proposed voir dire questions for the prospective jurors which were related to adverse publicity. At a pre-trial hearing on the eve of the trial the District Judge stated that after asking certain questions he would "invite questions" from counsel for the defendant and the prosecution "as it relates to the voir dire examination of the jury panel." The court advised defense counsel that it declined to use four of the proposed voir dire questions because they related to matters of law and contained statements that should properly be incorporated in the final instructions to the jury. Before the trial began on October 7, 1975 counsel again moved for a continuance, stating that the TODAY show that morning had carried a report on the Hoffa case which discussed a book containing references to the defendant. In denying the motion for continuance the court advised counsel for the defendant, ". . . what we will have to do, if your client was referred to this morning on the TODAY show, in the last chapter of the book on Hoffa, perhaps during the voir dire you can help the court in terms of asking that question, whether or not any of the prospective jurors saw the TODAY show and the reference to your client Mr. Giacalone."

The court conducted a preliminary voir dire examination. Addressing the entire array Judge Keith inquired as to pre-trial publicity as follows:

THE COURT: Now, does any prospective juror have any personal knowledge or information about or concerning the offense with which the defendant Anthony J. Giacalone, also known as Tony Giacalone, is charged in the indictment which the court has heretofore read to you—do you have any personal knowledge or do you know anything about it at all?

(no response)

Now, do any of you prospective jurors have any personal knowledge or information about or concerning the defendant Anthony J. Giacalone—do you know anything about him—have you heard anything about Tony Giacalone at all?

MALE JUROR: Read his name in the newspapers.

ANOTHER JUROR: I have, too. On TV. I have watched.

THE COURT: How many of you have read his name in the newspaper and have heard something about him on television, would you raise your right hand?

(show of hands)

THE COURT: That is everyone of you.

Now, do any of you, and I am speaking to all 12 of you, by reason of what you have read or heard in the newspapers or on television or on the radio believe that you could not be absolutely fair and impartial as it relates to this defendant, listen to the testimony that comes from the witness stand and look at the witnesses that testify and be guided by their testimony and the law as the court will subsequently charge you as it relates to this case—now, do any of you have such prejudice that it would be impossible for you to give this defendant the type of impartial trial that is guaranteed him by the 6th Amendment to the Constitution and clothe him and cloak him with the presumption of innocence that he has presently?

Now, do you think that you cannot be fair and impartial, if so, raise your hand.

(pause, evidently no hands raised)

Now, if you should unconsciously or unwittingly have any opinion, could you set aside that, without any reservation, and decide this case solely by the evidence that comes from the witness stand during the course of this trial?

Shortly thereafter the court asked all prospective jurors if any had seen the TODAY show that morning and received no response. After selection of jurors began each prospective juror was asked by the court if he or she had heard of the defend-

ant. Every venireman acknowledged having heard of the defendant from television or newspaper accounts, and all answered that this recognition would not prevent them from being fair and impartial in the case. Following questioning by the court, counsel for both sides were given an opportunity to question each prospective juror. Counsel for the defendant asked a number of them if they could put out of their minds the things they had read or heard about the defendant and give him the benefit of the presumption of innocence. Each person so questioned answered in the affirmative. One prospective juror started to make some reference to the defendant's reputation and was interrupted by defendant's counsel. Shortly thereafter this person was excused for cause at the request of the defendant.

During voir dire counsel for the defendant never suggested to the court that he wished to pursue the matter of pre-trial publicity beyond the questions which were asked. The defendant did not request an opportunity to question prospective jurors individually out of the presence of one another. In view of the questions which were actually asked and the responses received, we find nothing in the district court's refusal to ask the six voir dire questions submitted by the defendant which made it impossible to probe the prospective jurors properly on the effect of pre-trial publicity. There was no abuse of discretion in declining to use the questions offered by the defendant and no denial of an opportunity to conduct an appropriate voir dire. The record does not support the defendant's contention that he was prevented from conducting a meaningful voir dire. On the contrary, it is clear that defense counsel chose not to avail themselves of opportunities for further questioning.

### B. Publicity During the Trial

In a related matter the defendant contends that he was prejudiced by continued unfavorable media publicity which appeared during the trial. The defendant brought to the court's attention the fact that a radio news program and a newspaper

article had, reported the testimony of a government witness during the trial. These accounts added information which the jury had not heard in court that implied some connection between the defendant and James Hoffa. The defendant moved that the testimony of the witness be stricken "for prejudice." No request was made to question the jury on whether any of them had heard the newscast or read the article.

Another occurrence during the trial also involved the Hoffa association. Defense counsel advised the court that the Justice Department had released a status report on an investigation into the disappearance of James Hoffa and that local media outlets had given wide publicity to the report. This occurred approximately one week before the present case went to the jury. No particular action was requested by the defendant. There is no record of any other discussion of publicity during the trial.

After the verdict the defendant made a motion to allow the questioning of jurors "concerning their exposure to any evidence not of record, such as news releases, publications, and articles mentioned above . . .." The motion referred to a number of articles and broadcasts and copies of many articles were appended to it.

The district court admonished the jury daily throughout the trial not to read about the case or listen to broadcasts concerning it, or to discuss the case with anyone. After giving the jury this admonition at the end of the first day's proceedings the court invited the attorneys to "speak to any of these points." Counsel for the defendant did not speak. There is no indication in the record that any juror violated the court's instructions.

In *Rizzo v. United States,* 304 F.2d 810, 815 (8th Cir.), *cert. denied sub nom., Nafie v. United States,* 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962), the court cited many holdings to the effect that "[w]here a jury has been clearly admonished not to read newspaper accounts of the trial in which they are serving as jurors, it is not to be presumed that they violated that admonition." See also *Estes v. United*

*States,* 335 F.2d 609, 615 (5th Cir. 1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965). Since the defendant did not seek to question the jurors during the trial while the allegedly prejudicial publicity was currently appearing, there was no abuse of discretion in denying the request to question them after the trial was over, in the absence of some showing of violation of the court's clear instruction. See *United States v. Brumbaugh,* 471 F.2d 1128, 1130–31 (6th Cir.) (McCree, J., concurring), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973).

■ There was a great deal of publicity concerning the defendant both before and during the trial. The District Judge took pains to see that the jury considered only the evidence presented in court in deciding the case. Defense counsel were not restricted in their attempts to determine whether any prospective jurors had been influenced by pre-trial publicity. When publicity during the trial was brought to the district court's attention the defendant made no attempt to establish contamination of the jury. Widespread publicity about a defendant is not enough, standing alone, to require reversal of a conviction. This is particularly true when the publicity is largely unrelated to the trial which is imminent or in progress. There was no showing of actual taint in this case and none will be presumed. The fact that the defendant was subjected to considerable notoriety, whether justly so or not, does not render the courts of the United States incapable of providing him with a fair trial. *United States v. Medlin,* 353 F.2d 789, 792 (6th Cir. 1965), *cert. denied,* 384 U.S. 973, 86 S.Ct. 1860, 16 L.Ed.2d 683 (1966).

## THE JURY INSTRUCTIONS

■ The defendant contends that the district court erred in failing to give requested instructions which were based on the evidence. In this court the defendant argues that the district court failed to instruct on his theory of the case. This argument was not made to the District Judge, nor was the decision in *United States v.*

*Garner,* 529 F.2d 962 (6th Cir.), *cert. denied sub nom. Brown v. United States,* 426 U.S. 922, 96 S.Ct. 2630, 49 L.Ed.2d 376 (1976), cited to him. In *Garner,* we held that it is reversible error for a trial judge to refuse to present adequately a defendant's theory in a criminal case. In the present case the defendant offered a large number of separate instructions, each of which embodied some defense theory. Many of the proposed instructions were abstract statements of legal principles which probably would have only confused the jury, since they had no clear application to the evidence presented. Though the substance of many of the offered instructions was included in the court's charge, it declined to give them as offered.

After all the evidence was in, the court held an eight-hour session with counsel devoted entirely to the matter of jury instructions. The trial judge presented his proposed instructions and counsel commented on them seriatim. A number of changes were made in the instructions during this conference. After the court's proposed instructions had been considered and the court had ruled on various objections, counsel were permitted to make further objections "to what the court has not given." Counsel for the defendant then objected to the court's refusal to give nineteen tendered instructions. The court again declined to give the offered instructions. No discussion of the substance of these offered instructions occurred at this time. Instead, a defense attorney merely referred to each of the nineteen by the "title" which he had previously assigned to it.

Among the instructions offered by the defendant and refused by the court was the following:

### AGENCY

An agent is one who has the authority to act on behalf of another; called his principal, to transact what the principal may do, and to render an account of his activity to his principal. *Stephenson v. Golden,* 279 Mich. 710, 276 N.W. 849 (1937), on rehearing of 279 Mich. 493, 272 N.W. 881 (1937). It is not necessary that

the principal be disclosed to the third party that the agent is transacting business with. In such a case, the principal is legally referred to as undisclosed principal. *Dodge v. Blood,* 299 Mich. 364, 300 N.W. 121 (1941).

The expenses incurred by the agent in the performance of handling his principal's affairs are attributable to the principal, and not the defendant. *McKinnon* and *Mooney v. Fireman's Fund Indemnity Co.,* 288 F.2d 189 (6th Cir. 1961); *Bibb v. Allen,* 149 U.S. 481, 13 S.Ct. 950, 37 L.Ed. 819 (1893).

Whereupon if you find that Mr. Anthony J. Giacalone was acting as an agent for others such as his brother, Vito Giacalone, then such expenses he incurred are attributable to those other parties and not to Anthony J. Giacalone.

Furthermore, if you find that Mr. Anthony J. Giacalone paid bills for others such as his brother and son and on doing so used their money then such disbursements are theirs and cannot be charged or attributed to Anthony J. Giacalone. *McKinnon* and *Mooney v. Fireman's Fund Indemnity Co., supra; Bibb v. Allen, supra.*

The jury was not concerned with the Michigan law of agency, and the district court properly declined to give the instruction as offered. However, the final paragraph of the proposed instruction related directly to testimony by defense witnesses that Anthony Giacalone was spending their money rather than his own in a number of instances where the government had attributed the expenditures to Giacalone as nondeductible items.

On several occasions during the trial the court acknowledged to defense counsel, in the presence of the jury, its understanding that the defendant claimed some of the expenditures charged to him by the government actually were made with other peoples' money and that some of the payments were made by persons other than the defendant.[2] No limitations were placed upon the defendant's attempts to prove this claim. During closing argument defense counsel was permitted to argue at length that various expenditures involved funds of other persons for whom the defendant acted in some agency capacity. In the court's instructions the jury was directed to acquit the defendant if it found that the government had failed to establish the joint net worth of the defendant and his wife at the beginning of each of the indictment years or if it found that the evidence failed to reflect increased net worth and nondeductible expenditures substantially in excess of the income reported in each of the years; or if it had a reasonable doubt that any of these elements had been proven. Immediately following this portion of the charge the jury was instructed as follows:

> On the other hand, if the evidence in the case does establish beyond a reasonable doubt the maximum possible amount

2. Examples are

> THE COURT: No, the Court knows the position the Government has taken. The government has taken the position that this lady who was in charge out there received a certain amount of cash money from your client, Anthony Giacalone. It's your position that if Mr. Giacalone, that is if Mr. Anthony Giacalone took the money to this lady he was taking it as an agent of his brother who owned the boat well. The Court knows your position. (Transcript, page 12,150)

and

> THE COURT: Yes, yes, brought in cash and paid the marina bills. And you asked her, did she know whose cash that was and she said no, she didn't, but she just said that she knew Mr. Giacalone, Mr. Anthony Giacalone brought it in.

> It is your position that Mr. Anthony Giacalone did not own the boat well and that he was acting as an agent for his brother Vito Giacalone.

> The Government's position is that Mr. Anthony Giacalone paid this money to this lady and it was his money.

> It is a question of fact that has to be determined by the jury.

> Now, if the Court has misstated your position or misstated the Government's position, please correct the Court and we will make this adjustment so that we can move on.

> MR. DILLON: I believe the Court has stated the position correctly. My only point is that the Government introduced an exhibit today saying or suggesting that the boat well was owned by the Giacalone brothers. (Transcript, pages 12,303–04)

of Mr. and Mrs. Giacalone's net worth as of the beginning of the calendar years 1968, 1969, 1970 and 1971, and further establishes beyond a reasonable doubt that funds reflected in any increased net worth, plus nondeductible expenditures during such years substantially exceed the income reported on the tax returns, *you should then proceed to determine whether the evidence in the case also establishes beyond a reasonable doubt that such additional funds represented taxable income on which Anthony J. Giacalone willfully attempted to evade or defeat the tax as charged in the indictment.* (emphasis added).

We believe from reading the entire charge that it is clear the jury was instructed that only those expenditures of funds constituting taxable income of Mr. and Mrs. Giacalone could be considered in determining whether the government had sustained its burden of proving the defendant guilty beyond a reasonable doubt. The court's instructions limited the jury's consideration of expenditures to those which represented taxable income of Mr. and Mrs. Giacalone. The instruction offered by the defendant was merely a converse statement—that the jury could not consider disbursements made by the defendant for other people, using their money. The jury was instructed to consider all the evidence in the case. This required it to take into account the testimony of defense witnesses that expenditures attributed by the government to unreported income of the defendant actually were made from other sources. Since the instructions previously quoted permitted consideration only of expenditures of taxable income of the taxpayers, the entire charge required the jury to consider the defendant's claim in reaching its verdict. See *United States v. Herron,* 551 F.2d 1073 (6th Cir. 1977).

The instructions fully explained the net worth method as required by *Holland* and made it clear that the government had the burden of proving each element of the offense charged beyond a reasonable doubt. Read as a whole, the jury charge properly submitted the factual issues in the case.

Other arguments made by the defendant concerning the instructions do not require discussion.

## DUE PROCESS ISSUES

 The defendant also seeks reversal on the ground that various actions of the prosecution violated his due process rights. It is charged particularly that the prosecution repeatedly brought to the jury's attention the fact that the defendant exercised his Fifth Amendment right to remain silent. The defendant did not testify and his silence when charged with income tax evasion was not disclosed to the jury by cross-examining him, as was done in *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), and *Minor v. Black,* 527 F.2d 1 (6th Cir. 1975), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1198 (1976). Rather, several government witnesses testified that defendant's accountants and counsel failed to furnish certain requested information. No one testified for the defense that the requested information was withheld in the exercise of defendant's Fifth Amendment right to remain silent. In fact, the accountant testified that certain information was given to government agents in an attempt to assist them. In a net worth case the government is required to show that it has made a reasonable attempt to investigate any leads furnished by the taxpayer which suggest non-taxable sources of funds. It was not error to permit the prosecution to show that no such leads were furnished. An examination of the trial transcript reveals no effort by the government to create an inference of guilt from the silence of the defendant.

The other claims of due process violations relate to alleged failure by the government to disclose exculpatory evidence, prosecutorial misconduct and the reception of evidence of unsupported prior understatements of income by the defendant. An examination of the record relating to these charges fails to support the claim that defendant was denied a fair trial. The trial lasted approximately seven months. It

doubtless was not a perfect trial. However, there is no basis for a claim that the defendant was denied fundamental fairness. It was a hard-fought case, but there was no overreaching by the prosecution, and the presiding judge permitted the lawyers to "try their case" without undue interference by the court, while retaining control of the proceedings and guarding the rights of both parties.

## THE WIRETAP ISSUE

 In the early 1960's the government conducted a series of warrantless wiretaps at a Detroit business establishment owned by the defendant. Prior to trial the defendant made a motion under Rule 16, Fed.R. Crim.P., for disclosure of all the transcripts of the tapes made during this surveillance. Several deliveries of transcripts were made by government counsel, and at the time of the last delivery the prosecutor advised the court that the last of the transcripts of interceptions had been disclosed. The transcripts covered only 1963 and 1964. After the trial had ended a series of articles appeared in a Detroit newspaper which stated that the interceptions had taken place from 1961 to 1964 and that a much larger volume of intercepted material existed than had been delivered to the defendant.

The defendant made a motion for rehearing on his previously denied motion for a new trial. He also sought an evidentiary hearing to take the testimony of three reporters who had worked on the series of articles. The defendant maintains it was an abuse of discretion to deny these motions. An affidavit filed by counsel for the defendant in support of the motions did not establish that pre-1963 tapes existed. Rather, it disclosed that one of the newspaper reporters had told defense counsel that "to the best of his knowledge" the information in the articles was accurate and that he had seen transcripts which were bulkier than those received by the defendant from the government. He also said he was uncertain whether he had read any transcripts of 1961 or 1962 interceptions. The affidavit quoted another reporter who was involved in preparing the series as saying his information had come from a "reliable source." A government attorney stated in open court that to the best of his knowledge the defendant had received all the transcripts.

The evidence of the existence of undisclosed wiretap evidence was not sufficient to require a post-trial hearing. Even if such materials existed at one time the district court was justified in concluding that the government did not fail to disclose them in violation of its Rule 16 order. There was nothing in the affidavit of defense counsel which indicated that tapes or transcripts of 1961–1962 interceptions were in existence at the time the Rule 16 motions were made or that information from such interceptions formed any part of the government's case in this prosecution. The district court did not abuse its discretion in denying the motions to rehear the motion for new trial and to conduct an evidentiary hearing with respect to the newspaper accounts of pre-1963 electronic surveillance. See *United States v. Aiuppa*, 440 F.2d 893, 895 (10th Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 60, 30 L.Ed.2d 114 (1971).

The judgment of the district court is affirmed.