812 F.2d 1409
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Kenneth F. HILL and Donnita S. Hill, Defendants-Appellees.
 No. 85-5399.
 United States Court of Appeals, Sixth Circuit.
 Jan. 6, 1987.
 
 Before LIVELY, Chief Judge, and MERRITT and NELSON, Circuit Judges.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 Kenneth and Donnita Hill were indicted for willfully attempting to evade federal income taxes for the years 1978 through 1980, in violation of 26 U.S.C. Sec. 7201. A jury found both defendants innocent with respect to 1978 and guilty as to 1980. With respect to 1979, Mrs. Hill was found innocent and Mr. Hill guilty. After receipt of the verdict the district court entered a judgment of acquittal on all counts, holding that there was no evidence from which the jury could draw any logical conclusion as to whether taxes had in fact been underpaid in 1979 or 1980 or as to whether any underpayment had been willful. We agree that there was a failure of proof on the willfulness issue, and we shall affirm the judgment of acquittal on that basis.
 
 
 2
 * The income on which the Hills allegedly attempted to evade taxes was earned in a small unincorporated auto salvage business that Mr. Hill started in his home town of Cookeville, Tennessee, in mid-1977. Mr. Hill began operations at that time by renting a five acre lot on which he placed some 140 junked cars purchased for $50 each. Parts from those cars were sold primarily to auto repair establishments, gas stations, and other businesses in the Cookeville area. Mr. Hill bought additional junked cars at an initial rate of roughly two per week, and he eventually started disposing of stripped carcasses by having them "mashed" and selling them, at $25 or $50 each, for scrap.
 
 
 3
 Mr. Hill had space for up to 500 cars on his lot, and his year-end inventory during the late 1970's was in the neighborhood of 200 to 300 cars. He testified that he had more cars than that on hand at the end of 1980, but he did not keep inventory records and could not remember precisely how many cars he had in stock at any given time.
 
 
 4
 Mr. Hill was not an accountant. He held a degree in agronomy from Tennessee Technical University, from which institution he was graduated in 1970 after his studies had been interrupted by military service--occasioned, he testified, by low grades and the insistence of his draft board. Before starting his own business Mr. Hill worked for his brother in an auto body shop. There Mr. Hill wrote estimates and sales tickets, but he had no exposure to bookkeeping. He never filled out an income tax return, always engaging professional tax preparers to do that for him. Working with numbers, he testified, was not his strong suit.
 
 
 5
 Mr. Hill married one of his college classmates in 1969. Although Mrs. Hill took some business courses at Tennessee Tech, where she majored in secretarial science, she, like her husband, did no bookkeeping prior to 1977. Mrs. Hill was employed as a social worker and counselor in the early 1970's, and in 1977--by which time the couple had two small children--she began working full time as a real estate broker.
 
 
 6
 When Mr. Hill decided to go into the auto salvage business, he and Mrs. Hill consulted one William Davis--for 35 years a "public accountant" in Cookeville--and followed his advice on how to set up the books of the enterprise. The Hills did not think they could afford to hire a bookkeeper, as they testified, and they did their own record keeping. Their modus operandi, according to their testimony, was essentially as follows:
 
 
 7
 Whenever a sale was made at the auto salvage lot, Mr. Hill or an employee would write up a sales ticket on printed forms prepared in accordance with Mr. Davis's suggestion. Mrs. Hill never worked at the lot, and she did not write out any sales tickets. Mr. Hill would bring copies of the sales tickets home to his wife, and unless payment had been received at the time of sale, she would send a bill to the customer. Payments--typically made by check--were received by Mr. Hill at the lot, and he was responsible for depositing the sales receipts in a checking account maintained at the Citizens Bank of Cookeville in the name of Kenny's Auto Salvage. Mr. Hill would record the receipts on pieces of paper that he turned over to Mrs. Hill at home, and she would piece together state sales tax reports from those tickets on which she was informed payment had been received. Mrs. Hill also maintained a disbursements journal, reflecting checks written against the bank account, but it was not her practice to try to reconcile the sales tax reports with the deposits in the bank account. Mrs. Hill testified that she worked long hours at her real estate job, and between that and caring for her children, both of whom were still pre-schoolers, she had to fit her bookkeeping chores in when she could--usually late at night.
 
 
 8
 Each year at tax time Mrs. Hill would take her disbursement journal, sales tax returns, and real estate commission records to Mr. Davis, the public accountant. He would review the records with her, and either Mr. Davis or his wife would then prepare the Hills' federal income tax return. Mr. and Mrs. Hill would come in and sign the return on or about the 15th of April. The evidence indicated that the Hills followed whatever advice Mr. Davis gave them, and furnished him whatever information he requested, but did not engage him to audit their books.
 
 
 9
 Not until 1984, when they were charged with tax evasion, did the Hills calculate the total annual business deposits in the bank account and compare the deposits with the reported annual sales. When they made that comparison, at the suggestion of the lawyer they had retained to defend them, they found that the total receipts deposited by Mr. Hill between 1978 and 1980 averaged $90,765 per year, whereas the gross sales reported to the federal government averaged $70,340 per year--a total shortfall, over three years, of $61,275.[1] The gross sales reported for 1978 and 1979 approximated those shown on the state sales tax returns. In 1980 Mr. Davis decided that the sales figure looked low, and he increased it by approximately $28,000, telling the Hills he had done so.
 
 
 10
 If the reported gross receipts were understated, so too, it appears, were the reported cost-of-goods-sold expenses. The latter figures, as reported on Schedule C-1 of the federal tax returns, were derived by taking the dollar amount of the inventory at the beginning of the year, adding the cost of purchases during the year, and subtracting the dollar amount of the inventory at year-end. Instead of valuing his inventory on a cost basis, Mr. Hill, acting on guidance from the accountant, Mr. Davis, would count the number of cars on his lot at the end of each year and multiply that figure by what he thought the average car would bring when dismembered and sold for the value of the parts and scrap--"fair value, what you thought you could sell the stuff sitting on the lot for...." The year-end inventories, reported on this basis, were as follows:
 
 
 11
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 12
 To the extent that Mr. Hill may have valued his year-end inventory at more than the actual cost incurred in purchasing the junked cars, he was understating his cost of goods sold and was deducting less for that expense than he was entitled to deduct. Mr. Hill testified that he had no idea of the effect that different valuation methods would have on his return; he simply did what Mr. Davis told him to do.
 
 
 13
 When the Hills were investigated by the Internal Revenue Service, an agent spent many hours going over their records with them to determine what their net worth had been at the end of each year from 1977 through 1980. For purposes of this exercise all or substantially all of the Hills' assets seem to have been valued on a cost basis except for the inventory of junked cars. That inventory was plugged into the net worth study at the figures shown on Schedule C-1 of the Hills' federal tax returns, which figures presumably included both inflation and the potential value that would be added through dismembering the cars and selling them piecemeal.
 
 
 14
 At trial, the government put three witnesses on the stand: Mr. Davis, who testified as to his role in the preparation of the returns; the IRS agent, who explained how she had calculated the annual changes in Hills' net worth; and Mr. Archie M. Thurman, a certified public accountant with two accounting degrees, who used the annual net worth changes to compute "corrected" taxable income under the "net worth plus nondeductible expenditures method" described in United States v. Giacalone, 574 F.2d 328 (6th Cir.), cert. denied 439 U.S. 834 (1978), and the cases cited therein at 574 F.2d 330-31.
 
 
 15
 Mr. Thurman made his computations on the twin assumptions that the inventory figures had been reported on a cost basis and that the net worth figures had been stipulated. On cross-examination he conceded that it was not correct to report inventories on a fair value basis and that incorrect inventory figures would affect the amount of taxable income and the amount of tax due.
 
 
 16
 The Hills' tax returns for 1978 through 1980 indicated the following taxable income:
 
 
 17
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 18
 Using the net worth figures he thought had been stipulated as accurate, Mr. Thurman computed the corrected taxable income as follows:
 
 
 19
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 20
 On that basis, Mr. Thurman concluded that the Hills had understated their tax liability by the following amounts:
 
 
 21
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TABLE
 
 22
 The trial court denied a motion for acquittal at the end of the government's case, and both of the Hills then took the stand to testify in their own behalf. They explained their reliance on the advice received from accountant Davis, the manner in which year-end inventories had been valued, and the way in which their records were prepared. It was the Hills themselves who brought out the fact that the bank deposits had been found to exceed reported sales, and it was they who described a lack of internal accounting controls that could have resulted in a failure to discover reporting errors. At the conclusion of all the evidence the Hills again moved for a judgment of acquittal; the court took the motion under advisement, entertained post-trial briefs and arguments, and ultimately dismissed all charges for reasons stated in an eight-page memorandum opinion.
 
 II
 
 23
 The district court concluded that the government's proof as to the existence of a tax deficiency was fatally flawed. The inclusion of value-based inventory figures in the net worth calculation tended to overstate the annual changes in the Hills' net worth, the court believed, and because the effect of the possible errors was cumulative, the court thought that the Hills' net worth could have been overstated by as much as $71,452 in 1979 and $83,496 in 1980.
 
 
 24
 The government does not deny that the use of value-based inventory figures probably produced higher net worth estimates than the use of cost-based inventory figures would have done. If cost-based figures had been available, therefore, it would have been manifestly unreasonable not to use them, whether or not there happened to be a mistake in the government's favor on the taxpayers' returns; the purpose of the net worth analysis is to try to estimate the amount of annual taxable income on the basis of the actual expenditures reflected in annual increases in the taxpayer's net assets, not on the basis of any unrealized gain the assets may represent. If a taxpayer uses $1000 to buy raw materials that he expects to be able to resell in a subsequent year for $2,000, the fact that he had $1,000 to spend in the first year obviously does not indicate that he had $2,000 of income in that year, regardless of how he valued the inventory for tax purposes. It is income that is important, and a net worth analysis ought to be designed in such a way as to measure realized income with some degree of reliability. Cf. Banks v. Commissioner, 322 F.2d 530, 546 (8th Cir.1963) (opinion by Blackmun, J.)
 
 
 25
 In the case at bar the only inventory figures available to the government were those reported on the Hills' tax returns, and Mr. Hill--who was in a better position than anyone else to know how the value he placed on his cars compared with his actual costs--did not undertake to quantify the excess of value over cost. The use of value-based inventory figures in a net worth analysis does not invariably render the analysis inadmissible as a measure of income, and--as indicated by Judge Blackmun's decision in Banks, supra--it may be less likely to produce unacceptable distortions where the taxpayer has consistently valued inventories at market over a number of years. We do not believe that the net worth analysis prepared by the government here was so unreliable that it should have been held inadmissible, nor do we believe that its potential for error was as large as the district court thought.[2]
 
 
 26
 The record establishes that Mr. Hill did not acquire his junked cars for nothing. The least he ever paid was $50 per car, and he was never able to buy cars that cheaply after 1977. By the end of 1980, moreover, Mr. Hill had between 300 and 500 cars on his lot, as the jury could reasonably have inferred; those cars represented a substantial investment of funds for which there was no apparent source other than the cash flow of the business itself. During the closing argument on the motion for a judgment of acquittal, the trial court asked the Hills' lawyer if he agreed that the tax returns substantially understated the amount of the taxes due. The lawyer replied that "we would have to agree this is substantial," and he said that the Hills "stipulated, in essence," that the government had proved a substantial understatement of tax. On the record before us, we would be reluctant to ignore that concession.
 
 III
 
 27
 The fact that the reported tax liability may have been understated in some substantial amount does not in and of itself mean that the jury was entitled to infer that the Hills had "willfully" attempted to evade taxes. As the government acknowledges, willfulness is a separate element of the offense charged; it must be proved by independent evidence, and it cannot be inferred from the mere understatement of income. Holland v. United States, 348 U.S. 121, 139 (1954). No presumption of willfulness may be drawn from the act of filing an inaccurate tax return, for "many thousands of taxpayers do that innocently." Lurding v. United States, 179 F.2d 419, 422 (6th Cir.1950).
 
 
 28
 What independent evidence of willfulness exists here? The best statement of the government's position is found in the skillfully prepared closing argument of the prosecutor, who invited the jury to treat the following circumstances as evidence that the Hills consciously set about to cheat the government:
 
 
 29
 --They had their returns prepared by an accountant who was not a CPA, whose qualifications did not match those of the government's expert witness, and who did not know the proper way to arrive at inventory figures;
 
 
 30
 --The printed sales slips purchased by Mr. Hill were not numbered consecutively;
 
 
 31
 --The Hills kept no books except those required for tax purposes, and failed to establish an effective system of internal accounting controls;
 
 
 32
 --Bookkeeping and tax preparation responsibilities were divided among Mr. Hill, Mrs. Hill and Mr. Davis;
 
 
 33
 --The Hills failed to check the accuracy of Mr. Davis' work and failed to question his arbitrary increase in the gross sales figure for 1980; and
 
 
 34
 --The Hills failed to engage Mr. Davis to audit their books and check the accuracy of their records.
 
 
 35
 These circumstances are obviously not inconsistent with the hypothesis that Mr. and Mrs. Hill had the requisite guilty intent, but they seem no less consistent with the hypothesis that the Hills were, as they claimed, innocent:
 
 
 36
 --To suppose that the Hills purposely tried to shield themselves from criminal liability by knowingly selecting an incompetent accountant whose only demonstrable error favored the government would be to attribute to these taxpayers a truly extraordinary measure of prescience and sophistication;
 
 
 37
 --There is no evidence that the accountant or anyone else ever recommended the purchase of consecutively numbered sales slips, and there is no evidence that this idea ever crossed the mind of either defendant;
 
 
 38
 --In the absence of any indication that the Hills were advised to set up a system of internal accounting controls or to keep more extensive books than they thought the law required, their failure to do so could well indicate nothing more than an inaptitude for bookwork on Mr. Hill's part and a recognition by Mrs. Hill that there are only 24 hours in a day;
 
 
 39
 --Kenny's Auto Salvage was a quintessential mom and pop operation, and it is hard to see how any sinister inference could fairly be drawn from the fact that some of the bookkeeping burden was born by the mom and some by the pop, or from the fact that they contracted out what they knew they were incapable of doing themselves;
 
 
 40
 --The record suggests no reason to believe that the Hills thought themselves qualified to check the accuracy of their accountant's work, and the government itself suggested a highly plausible reason for the Hills' failure to become exercised over the accountant's arbitrary increase in reported sales at the conclusion of the tax period in question: the change had no material effect on the Hills' tax liability. Finally,
 
 
 41
 --There is no reason to suppose that the Hills' failure to hire someone to audit their books reflected anything other than an honest belief that it was not necessary and would not be worth the additional expense.
 
 
 42
 The jury was free to accept or reject the testimony of the Hills that they did not know their tax liability was being understated, of course, but mere disbelief could not supply proof of guilty knowledge; "[s]peculation and intuition cannot be substituted for proof." United States v. Pechenik, 236 F.2d 844, 847 (3d Cir.1956). See Spies v. United States, 317 U.S. 492, 499 (1943), where Mr. Justice Jackson, writing for the Supreme Court, gave the following illustrations of the kind of conduct from which "willful attempt" may be inferred: "keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."
 
 
 43
 There is no proof in this case that the Hills made any attempt to conceal any of their assets. The bank account maintained in the name of Kenny's Auto Salvage at the Citizens Bank of Cookeville was not exactly a unnumbered account in Zurich, and if Mr. Hill intended to conceal his business receipts, he chose a peculiar way of doing so. There is no evidence that Mr. Hill ever requested a customer to pay in currency rather than by check, and there is no evidence that substantial sums were received in currency and not deposited in the bank. There is no evidence that the Hills avoided making records they had reason to believe were usual in small businesses of this kind, and there is no indication that they kept double sets of books, or destroyed records, or falsified documents. They may well have been negligent, but they were not being tried for negligence; they were being prosecuted on felony charges, and they could not be convicted without independent proof of willfulness. Like the trial court, we find no such independent proof in the record; like the trial court we "cannot in good conscience assume Kenneth F. Hill and Donnita S. Hill into the penitentiary."
 
 
 44
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 One of the Hills' trial exhibits put the shortfall at $64,965, but this ignored an amended return increasing the reported sales for 1979 by $3,689
 
 
 [2]
 On the other hand, we are not overly impressed by the government's claim that the conclusions reached in the net worth analysis were "corroborated by the defendants' own admissions that they had underreported their taxable income by over $65,000...." The Hills admitted that they underreported their gross receipts by roughly that amount, but there is no serious dispute over the fact that the Hills' deductions for cost of goods sold were calculated under a method which, fairly applied, would tend to be overly generous to the government. The underreporting of gross receipts would necessarily be compensated for, in the calculation of net income, to the extent of any underreporting of deductible expenses
 The government also argues that if lower cost-based inventory figures had been used in the net worth calculation, the inventory figures reported in the tax returns would have had to be reduced correspondingly "in order to maintain comparability between the net worth computation and the tax return." Even if the tax liability reported by the Hills happened to be correct, in other words, the government seems to be suggesting that the Hills still ought to be convicted because they would have underpaid their taxes if they had valued their inventory correctly. That seems a bit harsh, to say the least.