UNITED STATES of America,
Plaintiff-Appellee,

v.

Brian A. CARLSON,
Defendant-Appellant.

No. 79–1277.

United States Court of Appeals,
Ninth Circuit.

Feb. 28, 1980.

Rehearing Denied May 8, 1980.

Peter R. Stromer, San Jose, Cal., for defendant-appellant.

Nancy Simpson, Asst. U.S. Atty., San Francisco, Cal., for the U. S.

Before WALLACE and KENNEDY, Circuit Judges, and LARSON,* District Judge.

WALLACE, Circuit Judge:

Carlson was convicted of willful failure to file income tax returns in violation of 26 U.S.C. § 7203. On appeal he seeks reversal by claiming that his failure to file proper returns constituted a valid exercise of his Fifth Amendment privilege against self-incrimination. We affirm the conviction.

---

\* Honorable Earl R. Larson, United States District Judge, District of Minnesota, sitting by designation.

## I

Carlson, a factory worker, earned $9,346.21 in 1974 and $13,053.53 in 1975. Although he had filed complete tax returns for previous years, Carlson did not do so for 1974 and 1975. Instead, as part of a tax protest movement, he utilized the following tax-evasion scheme for each of those years. In 1974, Carlson claimed 99 withholding exemptions on the withholding tax form (form W–4) that he submitted to his employer, although he was not married and had no dependents.[1] This form W–4 remained effective through 1975, and resulted in no federal income taxes being withheld from Carlson's wages in either 1974 or 1975. Carlson thereafter asserted the Fifth Amendment on his 1974 and 1975 year-end tax returns (form 1040) in lieu of providing any information from which his tax liability could be calculated. He appended to the 1974 return tax protest material claiming that federal reserve notes were unconstitutional, that he therefore had not received enough constitutionally valid money to require filing a tax return, and that all rules promulgated by the Secretary of the Treasury were also unconstitutional.

The result of Carlson's submission of the false withholding form and his subsequent assertion of the Fifth Amendment in his year-end returns was that Carlson paid no federal income taxes for 1974 or 1975. Carlson claims that he validly asserted the Fifth Amendment to avoid incriminating himself for having previously filed the false withholding forms. After hearing all of the evidence, however, the district judge, sitting without a jury, found that Carlson "did not have a good-faith claim or reasonable ground for [asserting the] privilege, as he was a tax protestor and his activities and his actions and methods of submitting his returns were those of a tax protestor only." He held, therefore, that Carlson's Fifth Amendment claim did not constitute defense to his prosecution, pursuant to section 7203, for failure to file a tax return.

---

1. Needless to say, 99 withholding exemptions far exceeded the number available to Carlson. 26 U.S.C. § 3402(f)(1).

## II

This case presents a question of first impression: can the privilege against self-incrimination constitute a defense to a section 7203 prosecution when it is asserted to avoid incrimination for a past violation of income tax laws? The United States Supreme Court has stated that "[a] section 7203 conviction cannot be based on a valid exercise of the privilege," *Garner v. United States,* 424 U.S. 648, 662, 96 S.Ct. 1178, 1186, 47 L.Ed.2d 370 (1976), but the Court expressly limited the reach of its decision in *Garner* to "only those [claims of privilege] justified by a fear of self-incrimination *other than under the tax laws.*"¹ *Id.* at 650 n. 3, 96 S.Ct. at 1180 (emphasis added). *Garner* thus left open the extent to which the Fifth Amendment prevents compelled self-incrimination in tax returns for past tax law crimes. No case has been cited to us, and we have found none in other circuits that has dealt directly with this question left open by *Garner.*² We must, therefore, confront the issue for the first time.

We have recently considered the validity of a Fifth Amendment assertion made in a tax return to avoid self-incrimination for non-tax-law violations. *United States v. Neff,* 615 F.2d 1235 (9th Cir., 1980). We held that the validity of such an assertion should be assessed in light of the following factors: whether the privilege was asserted at the time of filing the return and in response to specific questions contained therein, whether the taxpayer was faced with a real and appreciable danger of self-incrimination, and whether he had reasonable cause to believe that an honest response to the questions would provide a link in the chain of evidence needed to prosecute him for a crime. *Id.* Moreover, we determined that the trial judge is to ascertain the potentially incriminatory nature of elicited responses by examining the questions, their setting, and the peculiarities of the case,

with the burden of showing their hidden danger falling upon the taxpayer should the trial judge find the questions to be innocuous. *Id.,* at 1240.

An examination of the facts of this case reveals that Carlson did assert the privilege at the time he filed his return, and did so while facing a real and appreciable hazard of prosecution for having previously filed a false withholding form.³ In addition, there is little doubt that a truthfully completed tax return, stating his gross income, the lack of federal income taxes actually withheld, and the true number of available deductions would have provided " 'a lead or clue' to evidence having a tendency to incriminate" Carlson. *Id.,* at 1239. It is equally certain that a trial judge examining these facts would find a substantial threat of incrimination. Thus, it appears that Carlson satisfies those indicia of validity previously considered by us in cases where the privilege has been asserted to avoid self-incrimination other than under the tax laws.

When the privilege is asserted to avoid incrimination for past tax crimes, however, additional complications arise. If Carlson's assertion of the privilege were valid, it would license a form of conduct that would undermine the entire system of personal income tax collection. The essence of Carlson's plan was to claim 99 withholding exemptions so that no federal income tax would be withheld by his employer, and then to assert the Fifth Amendment privilege in lieu of a properly completed tax return, thus attempting to avoid both prosecution for the false withholding claim and payment of required income taxes. The widespread use of such a scheme would emasculate the present system of revenue collection which, by virtue of its scope alone, necessarily depends upon personal reporting by wage earners.⁴ We are thus

---

2. *United States v. Brown,* 591 F.2d 307 (5th Cir.), *cert. denied,* 442 U.S. 913, 99 S.Ct. 2831, 61 L.Ed.2d 280 (1979), confronted the same fact situation as that before us but did not resolve the question left unanswered by *Garner.*

3. The government concedes that Carlson could have been prosecuted under 26 U.S.C. § 7205 for filing a false withholding form.

4. Because withholding forms are filed only with the employer, 26 U.S.C. § 3402(f)(2), false

confronted with the collision of two critical interests: the privilege against self-incrimination, and the need for public revenue collection by a process necessarily reliant on self-reporting.

To decide which of these two interests prevails, we follow Supreme Court guidance:

> Tension between the State's demand for disclosures and the protection of the right against self-incrimination is likely to give rise to serious questions. Inevitably these must be resolved in terms of balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated lightly.

*California v. Byers,* 402 U.S. 424, 427, 91 S.Ct. 1535, 1537, 29 L.Ed.2d 9 (1971).[5] We approach this balancing task with care, for we believe that fundamental constitutional protections, such as the privilege against self-incrimination, may be limited only for the most substantial of reasons. *See id.* at 448, 91 S.Ct. at 1547 (Harlan, J., concurring). The Supreme Court has stated that "the privilege has never been given the full scope which the values it helps to protect suggest," *Schmerber v. California,* 384 U.S. 757, 762, 86 S.Ct. 1826, 1831, 16 L.Ed.2d 908 (1966), but it has also persistently instructed that the privilege "must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818,

---

forms are not readily detected by the Internal Revenue Service. This problem is compounded when the taxpayer successfully refuses to provide the IRS with information normally received in a tax return.

**5.** In *Byers,* a majority of the Court expressly adopted this balancing approach: three Justices joined Chief Justice Burger in the plurality opinion, *California v. Byers,* 402 U.S. 424, 425, 91 S.Ct. 1535, 1536, 29 L.Ed.2d 9 (1971), and Mr. Justice Harlan applied such a balancing analysis in his concurrence. *Id.* at 448–49, 91 S.Ct. at 1547–48. After articulating the balancing approach, however, the plurality opinion failed to apply it, *id.* at 427–34, 91 S.Ct. at 1537–41, and we thus recognize the plurality balancing language to be dictum. We agree, nonetheless, with Justice Harlan's conclusion that the Fifth Amendment's preference for an accusatorial (rather than inquisitorial) system of criminal law enforcement is not "of such overriding significance that [it] compel[s] substantial sacrifices in the efficient pursuit of other governmental objectives in all situations where the pursuit of those objectives requires the disclosure of information which will undoubtedly significantly aid in criminal law enforcement." *Id.* at 448, 91 S.Ct. at 1548 (Harlan, J., concurring).

The dissenting Justices in *Byers* argued forcefully that "this balancing inevitably results in the dilution of constitutional guarantees," *id.* at 463, 91 S.Ct. at 1555 (Black, J., dissenting), and that we should not "depart in the slightest way from the Bill of Rights." *Id.* See also *Olmstead v. United States,* 277 U.S. 438, 472–77, 48 S.Ct. 564, 570–72, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). We believe, however, that their absolute approach would undercut the precedent of *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (Fifth Amendment does not justify a

complete failure to file a tax return). It cannot be denied that the act of refusing to file a tax return may

> give rise to a permissible inference . . . that one who did not file was indeed engaged in criminal activity. The incriminating inference arises from inaction rather than from any utterance or active disclosure, but nevertheless there is an inference of a guilty state of mind, from which can be inferred the criminal facts. These inferences are made possible by the general obligation to report income and the exception when the report would result in an incriminating disclosure.

Mansfield, *The Albertson Case: Conflict Between the Privilege Against Self-Incrimination and the Government's Need for Information,* 1966 Sup.Ct.Rev. 103, 118. Consequently, were we to adhere to an absolute protection against incrimination, we would be forced either to abandon a highly important information gathering device or to engage in the fiction that it does not incriminate. We doubt that even the dissenters in *Byers* would be willing to carry the privilege so far.

We agree that " 'the scope of the privilege [does not coincide] with the complex of values it helps to protect.' " *California v. Byers, supra,* 402 U.S. at 449, 91 S.Ct. at 1548 (Harlan, J., concurring), *quoting Schmerber v. California,* 384 U.S. 757, 762, 86 S.Ct. 1826, 1831, 16 L.Ed.2d 908 (1966). Whether the government may punish a person who asserts the privilege in lieu of providing tax information "cannot be answered on the ground that compelling him to come forward is not incriminating, for it surely is. It can only be answered by determining whether the government's interest in raising revenue is sufficiently important to justify some reduction in the protection of the privilege." Mansfield, *supra,* at 120.

95 L.Ed. 1118 (1951); *see Arndstein v. McCarthy,* 254 U.S. 71, 72–73, 41 S.Ct. 26, 26–27, 65 L.Ed. 138 (1920); *Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 197, 35 L.Ed. 1110 (1892), *disapproved on other grounds, Kastigar v. United States,* 406 U.S. 441, 449–55, 92 S.Ct. 1653, 1658–62, 32 L.Ed.2d 212 (1972). In balancing Carlson's assertion of the privilege against the governmental interest in revenue collection, we conclude that there are two factors we should consider: the history and purposes of the privilege, and the character and urgency of the countervailing public interests. *California v. Byers, supra,* 402 U.S. at 449, 91 S.Ct. at 1548 (Harlan, J., concurring).

█ The history of the privilege against self-incrimination predates its enshrinement within the Bill of Rights. *See* 8 Wigmore, Evidence § 2250, at 267–92 (McNaughton Rev.1961); Pittman, *The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America,* 21 Va.L.Rev. 763 (1935). It initially arose in response to procedures whereby the ecclesiastical courts of England would compel one against whom no charge had been made to incriminate himself in response to broad, incrimination-seeking questions. McCormick on Evidence 248 (1972). The privilege, which had been recognized to some extent in colonial America, Pittman, *supra,* at 781, and which had been incorporated into the constitutions of several states prior to ratification of the federal Constitution, *id.* at 764–65, was adopted by the drafters of the Bill of Rights "not only [as] an answer to numerous instances of colonial misrule but [as] a shield against 'the evils that lurk[ed] in the shadows of a new and untried sovereignty.'" McCormick on Evidence, *supra,* at 248 *quoting,* Pittman, *supra,* at 789.

As history illustrates, the primary purpose of the privilege is protective.

The ancient privilege of a witness against being compelled to incriminate himself is precious to free men as a shield against high-handed and arrogant inquisitorial practices. It has survived centuries of controversies, periodically kindled by popular impatience that its protection sometimes allows the guilty to escape punishment. But it has endured as a wise and necessary protection of the individual against arbitrary power, and the price of occasional failures of justice is paid in the larger interest of general personal security.

*United States v. Washington,* 431 U.S. 181, 193, 97 S.Ct. 1814, 1821, 52 L.Ed.2d 238 (1977) (Brennan, J., dissenting). Stated differently, the privilege is an effort to "comply with the prevailing ethic that the individual is sovereign and that proper rules of battle between government and individual require that the individual not be bothered for less than good reason and not be conscripted by his opponent to defeat himself . . . . ." 8 Wigmore, Evidence § 2251, p. 318 (McNaughton Rev.1961).

In the case before us, Carlson has attempted to take advantage of the privilege's protective capacity to further a calculated effort to avoid the payment of taxes. Although it is true that Carlson actually seeks protection against self-incrimination for his prior tax crime, he does so only as part of an overall plan to evade taxes. The first step of that plan—submitting a false withholding form to his employer—was concealed from the Service by assertion of the Fifth Amendment on Carlson's year-end returns; and the very act of asserting the Fifth Amendment also effectuated the second step of the plan—failing to file meaningful returns that would divulge both his prior misstatement and his overall year-end tax liabilities. In other words, the Fifth Amendment was the linchpin of Carlson's plan to evade the payment of taxes. He used the privilege more as a sword than as a shield. *See United States v. Schmitz,* 525 F.2d 793, 795 (9th Cir. 1975); *accord, United States v. Newman,* 468 F.2d 791, 795 (5th Cir. 1972), *cert. denied,* 411 U.S. 905, 93 S.Ct. 1527, 36 L.Ed.2d 194 (1973). The history and purpose of the privilege do not, in light of such circumstances, weigh heavily in favor of extending its coverage to Carlson.

At the same time, the character and urgency of the public interest in raising reve-

nue through self-reporting weighs heavily against affording the privilege to Carlson. The federal government's power to raise revenue is its lifeblood. Were taxpayers permitted to employ Carlson's scheme, they could avoid filing completed tax returns and thereby severely impair the government's ability to determine tax liability. Such frustration of the self-reporting system would force the Internal Revenue Service either to investigate each citizen's claimed and permissible withholding exemptions in an effort to prosecute for each separate filing of a false withholding claim, or to bear the burden of investigating and calculating from scratch each citizen's tax liability in order to assess the appropriate amount of income tax. Needless to say, either alternative would be inordinately burdensome if not impossible.

■ Another factor in our weighing process is that the requirement of filing an annual income tax return is primarily designed to facilitate revenue collection, not criminal prosecution. "[T]he questions in the income tax return [are] neutral on their face and directed at the public at large." *Albertson v. SACB,* 382 U.S. 70, 79, 86 S.Ct. 194, 199, 15 L.Ed.2d 165 (1965). For this reason, refusal to file any return at all has never been protectable by a taxpayer's privilege against self-incrimination. *United States v. Sullivan,* 274 U.S. 259, 263–64, 47 S.Ct. 607, 607–08, 71 L.Ed. 1037 (1927). We think the policies that justify the Court's continued adherence to the rule in *Sullivan* are equally applicable here.

■ After weighing the appropriate factors, we conclude that the purpose and history of the privilege against self-incrimination do not compel protection of Carlson's actions, and that the character and urgency of the opposing revenue interests require that his scheme not be permitted. We therefore hold that an individual who seeks to frustrate the tax laws by claiming too

many withholding exemptions, with an eye to covering that crime and evading the tax return requirement by assertion of the Fifth Amendment, is not entitled to the amendment's protection.[6]

## III

■ In spite of our holding that Carlson is not entitled to protection of the Fifth Amendment, we still must review the district court's finding that Carlson did not assert his claim in "good faith." This finding is not mooted by our holding that Carlson's assertion of the privilege was invalid, due to a statement in *Garner*: "Because § 7203 proscribes 'willful' failures to make returns, a taxpayer is not at peril for every erroneous claim of privilege. . . . [A] defendant could not properly be convicted for an erroneous claim of privilege asserted in good faith." *Garner v. United States, supra,* 424 U.S. at 663 n. 18, 96 S.Ct. at 1187. The "good faith" referred to in *Garner,* of course, is not necessary for proper assertion of the privilege against self-incrimination: we do not normally examine the good faith of an individual seeking the privilege's protection, we simply examine the reality and appreciability of the hazard he claims to be facing. *United States v. Neff, supra,* 615 F.2d at 1239. In prosecutions of the kind before us, however, a defendant's assertion of even an invalid Fifth Amendment claim in "good faith" would defeat the section 7203 requirement that a failure to file income tax returns be "willful." Someone who thinks he is complying with the law cannot be said to be "willfully" violating it. Therefore, we must review the trial court's finding that Carlson did not make his claim in good faith.

The trial judge's determination was a finding of fact. "[U]pon appeal of a conviction in a criminal case the evidence must be considered in a light most favorable to the government and the findings of fact of a trial judge (or jury) may not be set aside

---

6. It may be that the crime of claiming too many withholding allowances, even when not undertaken as part of a scheme such as Carlson's, will never be protected by assertion of the Fifth Amendment on a tax return because of the character and urgency of the tax laws which may mandate such a result. We need not, however, decide that question to resolve this case.

**524**

unless clearly erroneous." *United States v. Glover,* 514 F.2d 390, 391 (9th Cir.), *cert. denied,* 423 U.S. 857, 96 S.Ct. 108, 46 L.Ed.2d 83 (1975); *United States v. Hood,* 493 F.2d 677, 680 (9th Cir.), *cert. denied,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974). The record clearly discloses that Carlson was a tax protestor who attempted to frustrate the tax laws by use of the Fifth Amendment. We cannot say that the trial judge's conclusion that Carlson failed to assert the privilege in good faith was clearly erroneous.

AFFIRMED.