STATE of North Dakota, Plaintiff
and Appellee,

v.

Scott W. FAUL, Defendant
and Appellant.

Cr. No. 733.

Supreme Court of North Dakota.

Dec. 19, 1980.

Robert W. Wirtz, Sp. Asst. Atty. Gen., State Tax Dept., Bismarck, and Gail H. Hagerty, Asst. State's Atty., Bismarck, for plaintiff and appellee; argued by Gail H. Hagerty.

Bickle, Coles & Snyder, Bismarck, for defendant and appellant; argued by James J. Coles, Bismarck.

SAND, Justice.

The defendant Scott Faul [Faul] appealed a county court with increased jurisdiction judgment of conviction resulting from a jury verdict finding him guilty of two counts of failure to file tax returns as required by § 57–38–45, North Dakota Century Code, for the years 1977 and 1978.

Faul had filed income tax returns (Form 37) with the State Tax Department for the years 1977 and 1978. Several spaces on both forms contained the notation "Object: Self-Incrimination."[1] The tax department informed him that Form 37 for these years, as he had completed them, did not constitute valid legal returns and that possible

---

1. Both tax returns were accompanied by thirteen pages of material which Faul relied on to explain his objection to supplying information upon which his tax liability could be ascertained. The materials included letters, newspaper clippings, portions of the United States and North Dakota Constitutions, and excerpts from case law.

action against him was contemplated by the tax department. Faul did not take any action to amend his return, and the Burleigh County State's attorney filed a criminal complaint charging Faul with failure to make a tax return for the years 1977 and 1978. At the trial Faul insisted on being his own counsel and acted pro se.[2] A jury found Faul guilty on two counts, and the court sentenced him to be confined in the county jail for a term of sixty days on each count and to pay a fine of $1,000 on each count. The court suspended the jail sentence and $300 on each fine on the condition that Faul commit no violations of criminal law or tax law for one year and that Faul comply with the filing requirements for 1977, 1978, and 1979 no later than 15 July 1980, and pay the fine by 2 June 1980. Faul appealed to this court and was represented by counsel. We affirm.

■ The privilege against self-incrimination must be validly exercised in order to properly claim it in connection with an income tax return. *Garner v. United States,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976); *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927). The privilege must be raised in the return, *Garner v. United States, supra,* and it may be raised only in response to specific questions rather than a blanket response to all questions asked in the return. *United States v. Sullivan, supra.* The privilege is not a defense to a prosecution for not filing any return. *United States v. Sullivan, supra.*

2. Faul acted as his own counsel. However, shortly before the second day of trial began an attorney briefly appeared with Faul. The attorney stated that Faul requested him to represent Faul. The attorney also stated that he would represent Faul if the trial were to be continued for at least one day to give him an opportunity to prepare for the trial. The court advised Faul and the attorney that it could not accede to their wishes under the circumstances.

3. The United States Law Week outlined the Ninth Circuit's ruling as follows:
   "While defendant's assertion of Fifth Amendment privilege on tax return was surrounded by indicia of validity that would have been sufficient in context of attempt to

■ The contention that a taxpayer may enter an objection or some other equivalent statement on the ground that the answers on the return or the completion of the spaces in a return would tend to incriminate the taxpayer has been rejected as being without proper foundation when the questions on the tax form do not suggest that the response would be incriminating. *United States v. Neff,* 615 F.2d 1235 (9th Cir. 1980), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980).

In *United States v. Carlson,* 617 F.2d 518 (9th Cir. 1980), *cert. denied,* — U.S. —, 101 S.Ct. 564, 66 L.Ed.2d 468 (1980)[3] the court addressed the question whether or not a person may claim a fifth amendment privilege on his tax returns to avoid incriminating himself for claiming too many withholding exemptions. The *Carlson* court recognized that a conviction cannot be based upon a valid exercise of the privilege against self-incrimination when the privilege is claimed to avoid self-incrimination other than under the tax laws. The *Carlson* court affirmed a conviction of willful failure to file an income tax return on the grounds that the record clearly disclosed that the defendant was a tax protester who attempted to frustrate the tax laws by the use of the fifth amendment. The court specifically concluded by saying:
   "We therefore hold that an individual who seeks to frustrate the tax laws by claiming too many withholding exemptions, with an eye to covering that crime and evading the tax return requirements by the assertion of the Fifth Amendment,

avoid self-incrimination other than under tax laws, it does not suffice in context of attempt to avoid self-incrimination for past tax crimes; government's interest in collecting tax revenues outweighs defendant's self-incrimination privilege in this context; in summary, individual who seeks to frustrate tax laws by claiming too many with holding exemptions, with eye toward covering that crime and evading tax return requirement by assertion of Fifth Amendment, is not entitled to that Amendment's protection; trial court's conclusion that defendant did not assert Fifth Amendment in 'good faith' was not clearly erroneous." — U.S. —, 101 S.Ct. 564, 66 L.Ed.2d 468 (1980).

is not entitled to the amendment's protection." *United States v. Carlson*, 617 F.2d 518, 523.

But in the instant case there was no showing that the privilege was exercised because of any other law, and more specifically the defendant Faul maintained that he was not in violation of any law but was innocent.

In *Dorgan v. Miller*, 297 N.W.2d 418 (N.D.1980), and *Dorgan v. Kouba*, 274 N.W.2d 167 (N.D.1978), we said that merely filing a tax form or a form not containing sufficient information [4] from which the tax liability can be determined does not constitute filing a tax return within the meaning of the tax laws. *E. g., United States v. Porth*, 426 F.2d 519 (10th Cir. 1970), *cert. denied*, 400 U.S. 824, 91 S.Ct. 47, 27 L.Ed.2d 53 (1970).[5] In *Miller* and *Kouba* a mandamus action was involved, whereas here we have a criminal action, but that does not alter the basic concept as to what constitutes a valid tax return.

■ The form (37) filed by Faul for the years 1977 and 1978 with wholesale objections in the various spaces does not constitute a return within the meaning of the tax laws. In effect, Faul did not file a return as required by law; thus, the rationale of *Sullivan*, which states that the fifth amendment will never justify a complete failure to file a return, applies to this case.

Faul asserts that the trial court erred in excluding the evidence which he contends would establish the validity of the assertion of his fifth amendment privilege by entering "Object: Self-Incrimination" in the various places in the tax return. He contends that making the entries in the tax returns spaces was the equivalent of asserting his fifth amendment privilege.

Faul also contends that the trial court erred in denying him the right to make an offer of proof as to matters not admitted into evidence.

Faul relies heavily on language in *Dorgan v. Kouba, supra*, and *United States v. Neff, supra*, to support his assertions.

In *Kouba* we said that it is within the court's province to determine whether or not a response is incriminating; that the privilege is valid if the danger of incrimination is "real and appreciable";[6] that it must appear that the answer may disclose a "necessary and essential link" in the chain of evidence to prosecute the taxpayer of a crime; and that the taxpayer must make some showing as to questions "neutral on their face and directed at the public at large" to apprise the court of the circumstances upon which the privilege is based.[7]

■ In determining whether or not a "real and appreciable" danger of incrimination exists, the "implications of the question[s] in the setting in which [they are] asked" must be examined. *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951).

Thus, in *Kouba* we evaluated the setting in which the questions were asked and held that there was no "real and appreciable" danger requiring fifth amendment protection.

---

**4.** Kouba's returns contained his name and his wife's name, his home address and zip code, the amount of state income tax withheld, and the amount claimed as refund. Thereafter, the response to every item of information required on the form was "Object."

Miller's returns contained his name, address, filing status and filing category. His 1976 returns contained single or double asterisks in most columns. His 1977 return contained the word "Object" in most columns.

**5.** Porth's return contained his name and references to various constitutional provisions which he believed excused him from filing a return. The return was devoid of any information concerning his income.

**6.** We noted that several other courts had articulated standards using slightly different terminology to determine the validity of the privilege.

**7.** We noted that this requirement may put the taxpayer in a "Catch-22" situation because the limited disclosure may destroy the privilege. We also pointed out in a footnote that a grant of immunity would be available to the taxpayer in a subsequent prosecution for a crime in which the State seeks to admit the tax return as evidence against him.

In *United States v. Neff, supra,* the Ninth Circuit Court of Appeals used fifth amendment analysis rather than relying upon the definition of a tax return to decide a case similar to the instant case.[8] The *Neff* court used language similar to that contained in *Kouba* and found that the "whole circumstances [were] 'innocuous and thus unprotected absent some positive disclosure by the witness of its hidden dangers.'" *United States v. Neff, supra* at 1240.

With these cases in mind, Faul asserts that because any fifth amendment claim hinges on the circumstances of each case, the trial court should have admitted evidence relating to Faul's fears of self-incrimination and it was reversible error for the trial court to deny him an offer of proof concerning that evidence.

Faul primarily relied upon existing circumstances and facts to justify the exercise of his privilege against self-incrimination. Faul operated a diversified farm consisting primarily of producing grain and milk on approximately 1,000 acres of land. In 1976, he became a member of the Board of Directors of the North Dakota Milk Producers Association [Board]. He also became president of the Drake Milk Producers Association, a local organization. As a member of the Board, he became involved in opposing certain proposed legislation dealing with the dairy industry. He, along with others, received word that they should drop their opposition to the legislation and "not rock the boat." In February of 1977 he attended a meeting of the Drake Milk Producers Association at which time there was some discussion regarding an investigation of the Drake Coop Creamery. The investigation supposedly was looking into possible criminal activity at the creamery. The Drake Milk Producers Association and the Drake Coop Creamery are not one and the same but they do have some connection. The creamery purchases some of the dairy products produced by members of the Drake Milk Producers Association.

Faul was concerned that he could become falsely implicated due to his connection with the creamery. An audit was performed at the Drake Coop Creamery which disclosed that Faul was entitled to an additional $442.16. Faul feared that all of this would tend to implicate him in certain criminal activities, despite his innocence. Based upon what he believed to be the law after he had studied certain cases, he entered "Object: Self-Incrimination" in the various spaces in the tax return, including the space provided for "chief occupation."

■ With reference to the space in Form 37 for "chief occupation" Faul initially failed to establish any reasonable grounds or facts why the occupation of being a farmer would tend to incriminate him or why any income received from farming or dairying activities would tend to incriminate him. Neither are we aware of any such grounds. Furthermore, Faul, at his trial, testified that he was a farmer involved in dairying activities.

As to the offer of proof[9] made or attempted by Faul, the record discloses that on several occasions after Faul attempted to introduce evidence to which an objection was sustained, proceedings were held in chambers with the State and Faul present, at which time the court admonished the defendant as to his behavior before the jury and explained the procedures to be followed in making an offer of proof (that offer is not made in the presence of the jury) and explained that the evidence intended to be introduced was irrelevant and hearsay. Faul argued with the trial judge. Later, during the trial the differences culminated in the following exchange:

---

8. Neff's return contained identification information and he responded to questions concerning his financial status with the words "Object: Self-Incrimination."

9. The excluded evidence consisted of the minutes of the Board of Directors of Milk Producers of North Dakota held on 4 Feb. 1977 in Bismarck; a letter dated 13 April 1977 from the Internal Revenue Service which stated that Faul's 1976 U.S. tax return did not comply with Internal Revenue Code Requirements; and a letter dated 24 May 1977 from the Milk Stabilization Board which stated that he was entitled to payment of $442.16 as a result of an audit.

"MR. FAUL: I wish the Jury would keep this in mind, please.

"This is going to be difficult. Well, the time went along and in April I received a letter from the Internal Revenue Service stating that my 1976 return—now, that's not a return that is stated—is stated—my 1976 tax return was not acceptable. I have this letter. I would like to ask that this be marked as a defense exhibit for identification.

"(Defendant's Exhibit No. 19 marked.)

"First, I will identify it. This is a letter from the Internal Revenue Service dated April 13, 1977. It's a form letter I received by registered mail return receipt requested. It's addressed to Scott William and Shauna Faul, Route Two, Box 134, signed Robert S. Terry (phonetic) Director of Service Center.

"MISS HAGERTY: Your Honor, this is a letter from the Internal Revenue Service and has absolutely no relevance in this case. There is no question about any of Mr. Faul's federal returns, and I would object to admission of this exhibit.

"MR. FAUL: It was every bit of relevance to the fact—

"THE COURT: Just a minute, Mr. Faul, I'm sustaining the objection.

"MR. FAUL: I would like to offer proof.

"THE COURT: All right. The offer of proof is denied.

"MR. FAUL: I haven't made it yet. I have the opportunity to make that offer of proof.

"THE COURT: I think the document that you've already identified—

"MR. FAUL: I will make my offer of proof.

"THE COURT: All right, Ladies and Gentlemen of the Jury. I apologize for this, but we are going to have a recess.

"MR. FAUL: I will not go into chambers. Anything that need to be said—I don't have anything to say that the Jury can't hear, and I hope that she—

"THE COURT: We're recessed. We'll meet in chambers.

"MR. FAUL: We will not meet in chambers. I am here; anything I have to say is going to be heard—"

Proceedings were held in chambers without the defendant present. Prior to the exchange above, the court admonished Faul that he could find himself in contempt of court.

■ We have previously stated that the rules or statutes should not be modified or applied differently merely because a party not learned in the law is acting pro se. *Latendresse v. Latendresse*, 294 N.W.2d 742 (N.D.1980); *Dorgan v. Mercil*, 269 N.W.2d 99 (N.D.1978); and *Lang v. Basin Electric Power Co.*, 274 N.W.2d 253 (N.D.1979).

■ When Faul decided to act pro se he assumed full responsibility and liability that went with that decision. He cannot expect the court to change the approved and required trial procedures simply to accommodate the whim and wishes of the defendant who is acting pro se. The practice of having the offer of proof made out of the hearing of the jury is designed to prevent the jury from hearing any evidence which is not admissible and to avoid a mistrial. Merely because a defendant acting pro se wishes to have the matter heard by the jury whether the jury is entitled to hear it or not does not constitute any grounds for changing the procedures. Faul's failure to abide by the accepted and recognized and required procedures leaves him in an untenable position to claim that the trial court erred by not allowing him to make his offer of proof as he desired. His contention in this respect is without merit.

■ With reference to the contention that the court erred in excluding certain evidence and testimony relating to Faul's fears of self-incrimination on the grounds that it was irrelevant or hearsay, the issue is not quite as clear as Faul represents it to be. We believe the court initially should have admitted the evidence, not for the truth of the information but to establish Faul's state of mind. *United States v. Jackson*, 621 F.2d 216 (5th Cir. 1980); *Unit-*

*ed States v. Adcock*, 558 F.2d 397 (8th Cir. 1977); Federal Rules of Evidence § 801.[10]

As Professor Wigmore has pointed out: "Whenever an utterance is offered to evidence the state of mind which ensued in another person in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as the Hearsay rule is concerned." 6 Wigmore, Evidence § 1789 (Chadbourn rev. 1976).

In this instance the evidence was relevant to Faul's fears of self-incrimination and was admissible.

Rule 52(a), North Dakota Rules of Criminal Procedure, provides that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

The comments to that rule state in relevant part:

"Subdivision (a) provides that any error, defect, irregularity or variance that does not affect substantial rights of an accused shall be disregarded. To determine whether error affecting substantial rights of the defendant has been committed, the entire record must be considered and the probable effect of the error determined in the light of all the evidence."

■■■■ Where an error violates a constitutional right of the accused, the prosecution must prove the error was harmless beyond a reasonable doubt. *State v. Hager*, 271 N.W.2d 476 (N.D.1978). Where an error is not of constitutional magnitude, the defendant is entitled to a reversal upon 'a showing that substantial rights have been denied. *State v. Hager, supra*. We have said that a defendant is entitled to a fair trial, but not necessarily to a perfect trial. *State v. Allen*, 237 N.W.2d 154 (N.D.1975).

■■■ Our review of the record reflects that the evidence was admitted during the course of the trial in one manner or another, and we cannot conclude that the trial court's initial ruling constituted reversible error. Although the error in this instance approaches constitutional magnitude, the problems relating to the presentation of evidence were brought about because of the ineptness of the defendant acting pro se. Furthermore, the refusal to make his offer of proof in the prescribed manner in chambers compounded the problem. In addition, Faul, on appeal, did not show what evidence was not admitted because of the court's ruling which would have established his justification for entering "Object: Self-Incrimination" in the various spaces on the tax return. Under the circumstances as we find them in this case, we conclude that the court did not commit reversible error.

■■■■ Faul finally contended that the court did not have jurisdiction to order him to make a timely filing of the North Dakota income tax returns for 1977, 1978 and 1979.

The failure to file proper income tax returns for the years 1977 and 1978 precipitated the criminal charges on which he was found guilty. The court imposed a sentence and in this instance suspended a part or parts of the sentence upon certain conditions. These conditions were that the defendant file proper returns for the years 1977 and 1978 and 1979 on or before a certain date and that the fine be paid on or before a certain date. The court in sentencing a defendant may use any legitimate sentence and may suspend a part of the sentence upon certain conditions. Section 12–53–13, NDCC. Here, the court required that defendant do certain acts which brought about the criminal charges and added that the defendant make a proper return for the year 1979. All of these matters relate to the basic difficulty that the defendant had which ultimately brought about the criminal charges and the conviction. Under these circumstances we do not believe the court committed any error; in fact, the court probably acted wisely in imposing the sentence and the suspension with the conditions attached.

The judgment of conviction is affirmed.

---

**10.** The North Dakota Rules of Evidence were modeled after the Federal Rules of Evidence and generally are construed similarly as the federal rules have been construed by the federal courts.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VANDE WALLE, JJ., concur.