RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0429P (6th Cir.)
File Name: 01a0429p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee/*
*Cross-Appellant (99-3863),*


      *v.*


JOE SABINO (99-3745);
DANIEL K. STEWART
(99-3785); DONNA G.
STEWART (99-3786),
      *Defendants-Appellants/*
      *Cross-Appellees.*

Nos. 99-3745/
3785/3786/3863

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 96-00046—Herman J. Weber, District Judge.

Argued: September 11, 2001

Decided and Filed: December 19, 2001

Before: DAUGHTREY and GILMAN, Circuit Judges;
COHN, Senior District Judge.[*]

_____

[*] The Honorable Avern Cohn, Senior United States District Judge for
the Eastern District of Michigan, sitting by designation.

---

**COUNSEL**

---

**ARGUED:**   Richard John Donovan, RICHARD J. DONOVAN & ASSOCIATES, Columbus, Ohio, Charles E. McFarland, Campbellsburg, Kentucky, for Appellants. Gregory V. Davis, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellee. **ON BRIEF:** Richard John Donovan, RICHARD J. DONOVAN & ASSOCIATES, Columbus, Ohio, Charles E. McFarland, Campbellsburg, Kentucky, for Appellants. Gregory V. Davis, Robert E. Lindsay, Alan Hechtkopf, UNITED STATES DEPARTMENT OF JUSTICE, APPELLATE SECTION, TAX DIVISION, Washington, D.C., for Appellee.

---

**OPINION**

---

AVERN COHN, Senior District Judge. Defendants Daniel Stewart (Mr. Stewart), Donna Stewart (Mrs. Stewart), and Joe Sabino (Sabino) (collectively the defendants) were convicted of conspiracy to defraud the United States by obstructing the functions of the United States Internal Revenue Service in violation of 18 U.S.C. § 371. The Stewarts were also convicted of tax evasion in violation of 26 U.S.C. § 7201.

The Stewarts appeal their convictions, raising the following issues: whether the Speedy Trial Act was violated; whether their Fifth Amendment right to remain silent was violated when their failures to file tax returns were charged as overt acts in the indictment and introduced as evidence at trial; whether the district court erred in allowing an IRS employee to testify as a summary witness for the government; whether the jury was properly instructed; and whether their net worth calculation was erroneous.

any physical threat to others; the absence of a risk of flight; and the conclusion that Sabino played a minor role in the conspiracy. The district court noted that this occasion was the second time since 1987 that it had downward departed in a case. The government cites *Tocco* to support its argument for reversal of the district court's determination. In *Tocco*, however, the court reversed a *ten-level* departure based upon the totality of the following circumstances: the defendant's overwhelming community service and support; the defendant's age and debilitating health; and the defendant's wife's poor health. *Tocco*, 200 F.3d at 432. By analogy, the district court in the case at bar departed only three levels *with* the inclusion of more factors. Although most of the factors in the case at bar do not ordinarily warrant a departure, the district court concluded that their confluence compelled a departure. Due to the relative small departure, we find that the district court did not abuse its discretion in the departing downward of Sabino's offense level by three levels.

### III.  *CONCLUSION*

For the reasons stated above, we find there is no basis on which to reverse the defendants' convictions or the majority of the district court's sentencing determinations. However, we find that the district court erred in failing to enhance each of the defendant's offense level for engaging in "sophisticated means," and in reducing Sabino's offense level for minor role. Therefore, the judgment of the district court is AFFIRMED in part and REVERSED in part, and REMANDED for re-sentencing consistent with this opinion.

could distinguish a case from the 'heartland' of cases." *United States v. Coleman*, 188 F.3d 354, 361 (6th Cir. 1999) (en banc) (citing U.S.S.G. § 5K2.0 cmt.)[6] Thus, a sentencing court is "required to consider the particular factors of [a] case as a whole, and any combination thereof, in determining whether there were sufficient extraordinary factors to take [a defendant's] case out of the 'heartland' of . . . cases." *Id*. at 362. However, a departure must be "reasonable in terms of the amount and the extent of the departure in light of the reasons for the departure. . . . In other words . . . the reasons [must] justify the magnitude of the departure." *United States v. Tocco*, 200 F.3d 401, 432 (6th Cir. 2000) (citing *United States v. Crouse*, 145 F.3d 786, 789 (6th Cir. 1998)).

The district court downward departed on Sabino's offense level by three levels so as to sentence him to probation.[7] The district court buttressed its departure based on the totality of the following circumstances: the death of Sabino's wife a few months before sentencing; Sabino's age (72) at the time of sentencing; his physical deficiencies and condition, particularly ailments with his eyes and ears; the absence of

---

[6] The commentary to U.S.S.G. § 5K2.0 provides:

The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of such characteristics or circumstances [not ordinarily relevant to a departure], differs significantly from the 'heartland' cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. However, the Commission believes that such cases will be extremely rare.

[7] A sentencing court may grant a defendant probation under § 5B1.1. Without this departure, at the time of his sentence, Sabino was at level 13. Given our findings that Sabino was not entitled to a reduction in offense level for minor role and should have had his offense level enhanced for sophisticated means, Sabino's offense level is 17 without the departure at issue.

Sabino appeals his conviction, arguing that there was insufficient evidence to convict him of conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

The government cross-appeals the district court's sentencing decisions, including: failing to enhance Mrs. Stewart's and Sabino's offense levels for obstruction of justice; failing to enhance each defendant's offense level for sophisticated concealment; reducing Sabino's offense level for a minor role in the offense; and granting Sabino a downward departure.

For the reasons that follow, the defendants' convictions will be affirmed. We find, however, that the district court erred in granting Sabino a minor role reduction and in failing to enhance the Stewarts' and Sabino's offense levels for sophisticated concealment. Therefore, the sentencing determinations will be affirmed in part and reversed in part, and the case will be remanded for re-sentencing consistent with this opinion.

## I. *BACKGROUND*

### A. *Factual Background*

In 1989, the Criminal Investigation Division of the Internal Revenue Service conducted an investigation of Phillip Marsh, the founder of an organization called the Pilot Connection Society (PCS), which, among other activities, instructed individuals on methods to avoid paying federal and state income taxes. Through the execution of a search warrant on Marsh's residence and property, the IRS obtained a list of people who were affiliated with the PCS. Two of the people on the list were defendants Daniel and Donna Stewart. The Stewarts owned and operated Danco Transmission, Inc. (Danco), in the Cincinnati, Ohio, area since 1971.

Because of their connection with PCS, the Civil Division of the IRS investigated the Stewarts' compliance with federal tax laws and discovered in 1992 that they were overdue in

submitting their 1990 tax return. The IRS queried the Stewarts about their failure to file the tax return. The Stewarts responded by "revoking" their tax returns from 1955 to 1989 (a declarative act which had no substantive effect on their tax obligations). A series of letters ensued between the IRS and the Stewarts, during which the Stewarts sent the IRS anti-tax information obtained through their connection with PCS and other sources. The Stewarts eventually filed their 1990 income tax return, but they did not file any personal income tax returns for the years 1991, 1992, 1993, and 1994. Danco also failed to file corporate tax returns in 1992, 1993, and 1994.

The IRS then commenced a criminal investigation of the Stewarts. The investigation established that in 1990, the Stewarts closed all of their personal checking and savings accounts, redeemed certificates of deposit and paid off loans. In addition, in 1991, they dissolved Danco pursuant to Ohio law. Danco, however, continued to operate. In reliance on the PCS "untax" instructions, the Stewarts created seven primary trusts and transferred all of their assets, including Danco, to the trusts. Evidence at trial showed that the trusts paid the personal and business expenses of the Stewarts and were used to purchase various personal items for use by the Stewarts and their family. There was no evidence at trial that the IRS received any of the requisite paperwork concerning the trusts; no fiduciary income tax returns were filed on behalf of the trusts from 1992 to 1994.

During the years the trusts "existed," the Stewarts asked relatives, friends, and employees of Danco to serve as trustees of the trusts. The nominal trustee for each of the trusts often changed. Evidence at trial established that many of the trustees did not know the nature of a trust or could not explain the nature of their responsibilities as trustee. Some trustees indicated that Mrs. Stewart guided the daily operations of the trusts. The evidence showed that Sabino served as the trustee for several of the trusts, and his signature or signature stamp

downward from a sentencing range when there is a mitigating factor that has not been adequately considered in formulating the Sentencing Guidelines. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. A sentencing court's decision to depart downward is reviewed for an abuse of discretion. *See Koon v. United States*, 518 U.S. 81, 92 (1996). Whether a stated ground for departure is a permissible basis is a question of law reviewable *de novo*. *See id*. at 98.

Before a departure is authorized, the sentencing court must deem the circumstances of the case sufficiently atypical and outside the heartland of cases. *See id*. at 98. To determine whether a factor which takes a case outside the heartland should result in a different sentence, a district court must first decide whether the factor is forbidden, encouraged, discouraged, or unaddressed by the guidelines as a potential basis for departure. *See id*. If a factor is forbidden, a sentencing court abuses its discretion in using it to depart from the Sentencing Guidelines. *See id*. If a factor is encouraged, a sentencing court may depart if the Sentencing Guidelines do not already take that factor into account. *See id*. If a factor is discouraged, or is an encouraged factor already considered by the Sentencing Guidelines, a sentencing court may depart only "if the factor is present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present." *Id*. Finally, a district court may depart on the basis of a factor not addressed by the Sentencing Commission if it finds, "after considering the structure and theory of relevant individual guidelines and the [Sentencing] Guidelines taken as a whole," that the factor takes the case out of the applicable guideline's heartland. *Id*. at 94. A district court departing on the basis of an unenumerated factor, however, should "bear in mind the Commission's expectation that [such] departures. . . will be 'highly infrequent.'" *Id*. at 96 (quoting U.S.S.G. ch. 1, pt. A.).

As a panel of this court has said, the Guidelines "explicitly acknowledge that a combination or aggregation of factors

(applying § 3C1.1 enhancement for additional obstructive conduct committed after underlying offense); *United States v. Agoro*, 996 F.2d 1288, 1292-93 (1st Cir. 1993) (same); *United States v. Lueddeke*, 908 F.2d 230, 234-35 (7th Cir. 1990) (same).

Analysis of the trial court record establishes that imposing a § 3C1.1 enhancement in this case would constitute double-counting. In arguing for application of the enhancement to Sabino and Mrs. Stewart, the government relies upon "Sabino's testimony that the Stewarts had no interest in the Redna Terrace Property and that he had never discussed the Stewarts' business affairs with Sam Spine," and Mrs. Stewart's false testimony to the grand jury that she did not know Sam Spine.[5] The superceding indictment, however, lists false testimony to the grand jury as an overt act in furtherance of the conspiracy. That the government treated the conduct before the grand jury as a part of the conspiracy is reflected in the observation that the original indictment, which did not incorporate a conspiracy charge, did not mention any false testimony before the grand jury. The government called the grand jury reporter as a witness at trial to read the portions of the grand jury testimony that contained the false testimony. Surely, the jury, with copy of the superceding indictment in hand, could have determined that the statements were 'part and parcel' of the conspiracy. We find, therefore, that the district court did not err in failing to enhance Sabino and Mrs. Stewart's sentences for obstruction of justice.

### 4. *Downward Departure: Sabino*

In its final assignment of error, the government argues that the district court erred in granting Sabino a downward departure on his sentence. A sentencing court may depart

---

[5]*See* Final brief of the Appellee/Cross-Appellant, filed June 25, 2001, at 39, 41.

appeared on many of the documents regarding transactions undertaken by the trusts.

### B. *Procedural Background*

A federal grand jury returned an indictment against the Stewarts on April 2, 1996, and a superceding indictment on June 19, 1996, adding Sabino as a defendant. The superceding indictment charged Sabino and the Stewarts with conspiracy to defraud the United States by obstructing the functions of the Internal Revenue Service in violation of 18 U.S.C. § 371, and the Stewarts with an additional four counts of willfully attempting to evade income taxes in violation of 26 U.S.C. § 7201. Following a 32 day trial, the jury returned guilty verdicts against the three defendants on all counts, except that Mr. Stewart was acquitted on the charge of willfully attempting to evade income taxes for 1994.

A motion for judgment of acquittal, pursuant to FED. R. CRIM. P. 29, was denied. The district court sentenced each of the Stewarts to 18-month concurrent terms of imprisonment on each count of conviction, three years supervised release, and fined them each $41,750. Restitution totaling $129,000 was ordered.

Sabino was subject to a 12 to 18 month sentence of incarceration under the guidelines. The district court granted a motion for downward departure and sentenced him to five years' probation. Sabino was included in the ordered restitution of $129,000 jointly and severally with the Stewarts.

## II. *DISCUSSION*

### A. *Speedy Trial Act*

#### 1.

The Stewarts argue that the district court erred in denying their motion to dismiss the superceding indictment because of a violation of the Speedy Trial Act, 18 U.S.C. § 3161 (the STA), which requires that a criminal defendant be brought to trial within 70 days from the latest date of arrest, the filing of an indictment, or the first appearance before the court. *Henderson v. United States*, 476 U.S. 321, 323 (1986). The STA provides that if this time limit is exceeded, an indictment "shall be dismissed on motion of the defendant," with or without prejudice. 18 U.S.C. § 3162(a)(2). However, the STA also provides for periods of excludable delay during which the 70-day "clock" does not operate. *See id*. § 3161(h). The district court has discretion to exclude a delay from the 70 day time limit, and a decision to exclude a delay will only be reversed upon a showing of actual prejudice. *United States v. Cianciola*, 920 F.2d 1295, 1298 (6th Cir. 1990) (citing *United States v. Monger*, 879 F.2d 218, 221 (6th Cir. 1989)).

The indictment was returned on April 2, 1996; the superceding indictment was returned on June 19, 1996. The district court granted indefinite ends-of-justice continuances on May 29, 1996, September 20, 1996 and October 31, 1996 on the basis that the case was complex. The Stewarts filed a motion to dismiss the indictment for violating the STA on June 2, 1998. The Stewarts concede that several of their motions delayed commencement of the STA clock. They argue that the STA clock began ticking on April 3, 1997, when the district court acknowledged receipt of IRS jury information, the final information requested in their remaining motion made after their arraignment on May 20, 1996. Discounting excludable delay periods after the clock commenced until the trial on July 7, 1998, the Stewarts argue that 350 non-excludable days passed in violation of the STA.

that the district court erred in finding that Sabino's and Mrs. Stewart's false statements before the grand jury were not material misrepresentations.

The § 3C1.1 enhancement is applicable to § 371 conspiracies. Commentary to § 3C1.1 provides that the enhancement will not apply to persons convicted of "Contempt," "Obstruction of Justice," "Perjury or Subornation of Perjury; Bribery of Witness," "Failure to Appear by Defendant," "Payment to Witness," "Accessory After the Fact," or "Misprision of Felony," unless "a significant further obstruction occurred during the investigation, prosecution, or sentencing of the prosecution for the obstruction offense." *See id*. § 3C1.1 cmt. n. 6 (1995). By logical extension of Comment 6, the Sentencing Guidelines do not prohibit application of the § 3C1.1 obstruction enhancement to a § 371 conspiracy. If "further" obstructive conduct may lead to an enhancement of the intrinsic obstruction offenses listed in Comment 6, surely the enhancement may be applied as punishment for obstructive conduct committed after the termination of a § 371 conspiracy. *See United States v. Furkin*, 119 F.3d 1276, 1285 (7th Cir. 1997).

A panel of this court has signaled that a sentencing court may not apply the § 3C1.1 enhancement if the application entails double-counting, i.e., where the obstructive conduct is "part and parcel" of the underlying offense of conviction. *See United States v. Blandford*, 33 F.3d 685, 710 n. 27 (6th Cir. 1994) (rejecting double-counting argument by noting that defendant uttered a material false statement during pre-trial investigation *and* during trial testimony, thus constituting "separate incidents occurring at separate times"); *see also United States v. Lloyd*, 947 F.2d 339, 340 (8th Cir. 1991) ("Section 3C1.1 does not apply to conduct that is part of the crime itself.") (citing *United States v. Werlinger*, 894 F.2d 1015, 1017-19 (8th Cir. 1990)); *United States v. Ransom*, 9 F.3d 707, 708 (8th Cir. 1993) (per curiam) (same); *c.f.*, *United States v. Fredette*, 15 F.3d 272, 275-76 (2d Cir. 1994)

relevant conduct rules. *See* U.S.S.G. Supplement to Appendix C, Amendment 577 at 6 (1998); U.S.S.G. § 1B1.3(a)(1)(B).

The complexity of the case and the use of the seven trusts in the tax evasion conspiracy constitutes sophisticated concealment. Therefore, the district court abused its discretion in failing to apply the sophisticated concealment enhancement to Sabino.

### 3. *Obstruction of Justice Enhancement*

The government argues that the district court's failure to apply an obstruction of justice enhancement to Sabino's and Mrs. Stewart's offense levels constituted error. The Sentencing Guidelines provide that "[i]f [a] defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense. . . increase the offense level by 2 levels." U.S.S.G. § 3C1.1 (1998). On appeal, a district court's legal interpretation of the Sentencing Guidelines provisions is reviewed *de novo*. *United States v. Jones*, 107 F.3d 1147, 1161 (6th Cir. 1997). On appeal, however, we may not reject the district court's factual findings unless they are clearly erroneous. *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998).

The government argues that Sabino's and Mrs. Stewart's sentences should have been enhanced due to false testimony they gave in grand jury proceedings. As observed by the government, a sentencing court must apply the enhancement if a defendant provides a materially false statement to a grand jury. *See United States v. Mahaffey*, 53 F.3d 128, 133-34 (6th Cir. 1995). The government argues that the district court declined to apply § 3C1.1 in part because it erroneously determined that obstruction of the lawful operation of the United States is the essence of a § 371 conspiracy; and, therefore, the obstruction of justice is included in the consideration of the guidelines. The government also argues

The district court denied the Stewarts' motion to dismiss on June 3, 1999, relying partially upon a finding that continuances were warranted to serve the ends of justice as a result of the case's complexity. The Stewarts argue that the district court did not make sufficient findings to buttress an ends-of-justice continuance based on the complexity of the case.

According to § 3161(h)(8)(A), delay resulting from a court-ordered continuance is excluded if it is based on a finding that the ends of justice served by the continuance "outweigh the best interest of the public and the defendant in a speedy trial." When granting an ends-of-justice continuance, the district court must set forth its actual reasoning for the continuance in the record. *See* 18 U.S.C. § 3161(h)(8)(A); *United States v. Crawford*, 982 F.2d 199, 204 (6th Cir. 1993).

In its June 3, 1999 order, the district court clearly stated that it granted a continuance due to the complexity of the case and that the continuance served the ends-of-justice. The district court referred back to its previous oral and written orders that granted continuances based upon ends-of-justice findings stemming from the complexity of the case. The record establishes that the district court declared the case as complex, ostensibly with the agreement of the defendants' attorneys. This was a tax evasion case of complex proportions involving the wrongful use of third parties and the hiding of assets in trusts. The district court convened periodic status conferences to ensure that the case proceeded expeditiously to trial. Furthermore, the Stewarts waited to bring a motion to dismiss the indictment over a year after the date on which they contend the STA clock commenced. The Stewarts' tardiness reflects their agreement with the district court's calendar for bringing the case to trial. Accordingly, the district court did not abuse its discretion in granting ends-of-justice continuances.

                        2.

The Stewarts also argue, relying upon Ninth Circuit precedent, that the district court erred in granting indefinite ends-of-justice continuances. *See United States v. Clymer*, 25 F.3d 824, 828 (9th Cir. 1994) (holding that an ends-of-justice continuance must be specifically limited in time). While this Circuit has not addressed this particular issue, other circuits have, with results contrary to the Ninth Circuit's holding. In *United States v. Rush*, 738 F.2d 497 (1st Cir. 1984), the First Circuit remarked that "[t]he purpose of (h)(8) continuance is to make the [STA] 'flexible enough to accommodate the practicalities of our adversary system.' We do not think a rule barring open-ended continuances altogether serves this purpose." *Id*. at 508 (quoting *United States v. Mitchell*, 723 F.2d 1040, 1044 (1st Cir. 1983)). The First Circuit opined that open-ended ends-of-justice continuances may be limited by a reasonableness requirement so as to prevent unfair delays and circumventions. *Id*.; *see also United States v. Pringle*, 751 F.2d 419, 433 (1st Cir. 1984). The Third Circuit also rejected a bar against open-ended continuances, but it expressly adopted a reasonableness limitation upon justified delays. *See United States v. Lattany*, 982 F.2d 866, 868 (3rd Cir. 1992). Several other circuits have followed the First and Third Circuits. *See United States v. Jones*, 56 F.3d 581, 586 (5th Cir. 1995) (district court may grant open-ended continuances in situations where "it is impossible, or at least quite difficult, for the parties or the court to gauge the length of an otherwise justified continuance."); *United States v. Spring*, 80 F.3d 1450, 1458 (10th Cir. 1996) (agreeing with the First, Third, and Fifth Circuits that open-ended continuances for a reasonable time period are warranted in some cases); *see also United States v. Burke*, 673 F.Supp. 1574, 1578 (N.D. Ga. 1986) (in some cases open-ended ends-of-justice continuances are warranted). The Second Circuit held that the "length of an exclusion for complexity must be not only limited in time, but also reasonably related to the actual needs of the case." *United States v. Gambino*, 59 F.3d 353, 358 (2d Cir. 1995) (citing *United States v. Beech-Nut*

So I would tentatively rule that I would not enhance the offense level by the two points suggested that this was sophisticated, realizing that in this case the Stewarts controlled the entities; that the Stewarts conducted the business; and that the business was conducted in an open and straightforward manner as far as I can tell at all times. The checks were deposited as far as I can tell. And I would conclude that the enhancement for sophisticated means in this case is not appropriate."

In a subsequent statement, the district court remarked, with respect to the conspiracy, "[t]here were no offshore bank accounts[,] [t]here were no aliases used[,] [t]here were no fictitious names used."

Because of the complexity of the circumstances of this case, in which numerous banks and lenders were called to testify, and the fact that the defendants used at least seven trusts to evade the payment of taxes, we hold that the district court abused its discretion in failing to apply the sophisticated concealment enhancement to the Stewarts.

              b.  *As applied to Sabino*

Sabino acted as trustee for several of the trusts used by the Stewarts. He permitted the Stewarts to use his signature stamp to deposit money into banking accounts to use as funds for their personal expenses. Sabino participated in the acquisition of property for the Stewarts so as to conceal their ownership interests. Sabino also participated in the placement of a bogus mortgage on the Stewarts' residence. These actions establish that Sabino was intimately involved in the operation of the trusts and in the conspiracy. His actions enabled the Stewarts to maintain the trusts and to evade the IRS. Accordingly, the sophisticated concealment enhancement is applicable to Sabino based on his participation in the conspiracy. Further, the Stewarts' actions in connection with the trusts were reasonably foreseeable acts in furtherance of the conspiracy in accordance with the

accounts he knew to be a sham, and received $2,375 from one of the accounts. The IRS had to summons bank records from approximately six banks over the course of several months in order to trace the money [the defendant] helped to hide. The investigating IRS agent testified that setting up the tax avoidance scheme required sophistication, and that it required a more complex investigation than that necessary for a false entry on a 1040 form.

*Id.* at * 4 (citing *United States v. Pierce*, 17 F.3d 146, 151 (6th Cir.1994).

### a. *As applied to the Stewarts*

The district court erred in failing to apply the sophisticated concealment enhancement to the Stewarts. The district court noted the "monumental work" that the IRS special agent engaged in to present the case for trial, but it declined to apply the enhancement for the following reasons:

"[T]his Court cannot find by a preponderance of the evidence that this is a sophisticated scheme. It is so typical of a scheme that was originated by this Pilot Connection. As Mr. Dickstein [Mr. Stewart's counsel] has pointed out . . . it's a tax protestor case; that it's the relationship between these taxpayers and the government was always straightforward and that they did make slips in that relationship. But basically the situation as I found it and as I listened to the trial, even though the case was complex, even though the case was many, many exhibits, that for the purpose of sentencing I agree with the analysis that this, quote, is a run-of-the-mill of a tax case even though it is extremely complex, time consuming, and I think even the time we've spent on the sentencing issues demonstrates its complexity and the need with the case – and the time the case needed to properly be presented.

*Nutrition Corp.*, 871 F.2d 1181 (2d Cir. 1989), *United States v. LoFranco*, 818 F.2d 276, 277 (2d Cir. 1987)).

In *Henderson v. United States*, 476 U.S. 321 (1986), the Supreme Court discussed the propriety of a reasonableness requirement with regard to another provision establishing delays excludable from the STA's clock, specifically 18 U.S.C. § 3161(h)(1)(F), which excludes from speedy trial calculations any period of delay caused by a pretrial motion. The Supreme Court reasoned that the STA employs a reasonableness standard for the exclusion of time only when Congress explicitly requires that the period of delay be reasonable.[1] With respect to the possibility of potentially excessive continuances, the Supreme Court found that Congress left such considerations within the control of district courts rather than the statute itself. *See Henderson*, 476 U.S. at 328. By analogy, § 3161(h)(8) also does not contain a reasonableness requirement since its language mirrors § 3161(h)(1)(F) in all pertinent respects. Since *Henderson* signals that district courts may devise their own time limits with respect to this issue, we will follow the rule of the First, Third, Fifth, and Tenth Circuits and hold that open-ended ends-of-justice continuances for reasonable time periods are

---

[1]The Supreme Court stated:
On its face, subsection (F) excludes "[a]ny period of delay" caused by "any pretrial motion," "from the filing of the motion through the conclusion of the hearing." The plain terms of the statute appear to exclude all time between the filing of and the hearing on a motion whether that hearing was prompt or not. Moreover, subsection (F) does not require that a period of delay be "reasonable" to be excluded, although Congress clearly knew how to limit an exclusion: in § 3161(h)(7), Congress provided for exclusion of a "reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." Apart from this single instance, every other provision in § 3161(h) provides for exclusion of "any period of delay."

*Id.* at 326-27.

permissible in cases where it is not possible to preferably set specific ending dates.

The district court's oral and written rulings granting the ends-of-justice continuances demonstrate that this case deserved open-ended continuances. The delay in commencing trial was reasonable given the volume of evidence the government marshaled and the complexity of the defendants' tax evasion scheme. Further, a large portion of the pre-trial period was spent addressing the defendants' numerous motions. Accordingly, there was no unreasonable delay in the management of this case and the STA was not violated by the district court's granting of open-ended ends-of-justice continuances.

### B.  *Fifth Amendment Claim*

During the government's investigation of the conspiracy in 1992, an IRS investigator during an interview read the Stewarts their *Miranda* rights. Thereafter, an attorney allegedly advised them not to file income tax returns because doing so would constitute the making of self-incriminating statements. The Stewarts argue that their Fifth Amendment right to remain silent was violated because their failures to file tax returns were charged as overt acts in the indictment and additionally the failure to file the returns was introduced at trial as evidence of their willfulness in evading taxes.

A taxpayer claiming a Fifth Amendment privilege against the filing of a tax return must specifically claim the privilege "in response to particular questions, not merely in a blanket refusal to furnish any information." *United States v. Saussy*, 802 F.2d 849, 855 (6th Cir. 1986) (quoting *United States v. Johnson*, 577 F.2d 1304, 1311 (5th Cir. 1978)). Further, "taxpayers cannot assert a violation of their rights against compulsory self-incrimination when they refuse to answer questions on a tax return for fear authorities will discover illegal activity." *United States v. Sturman*, 951 F.2d 1466,

The sophisticated concealment enhancement is applied to a defendant "based on the overall offense conduct for which the defendant is accountable" according to the "usual relevant conduct rules." U.S.S.G. Supplement to Appendix C, Amendment 577 at 6 (1998). The relevant conduct guideline provides that "[i]n the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" are used to set a defendant's offense level. U.S.S.G. § 1B1.3(a)(1)(B).

Complex schemes of tax evasion warrant imposition of the sophisticated concealment enhancement. In *United States v. Morris*, No. 99-3905, 2001 WL 92126 (6th Cir. Jan. 23, 2001), a panel of this court affirmed the application of the "sophisticated means"[4] enhancement to the defendant's offense level, noting the defendant's acknowledgment that he used two nominee trusts to conceal his income and assets. The panel stated that "*the use of nominee trusts constitutes a sophisticated means to conceal tax evasion offenses.*" *Id.* at * 3 (emphasis added) (citing *United States v. Minneman*, 143 F.3d 274, 283 (7th Cir. 1998).

Similarly, in *United States v. Spine*, No. 99-3808, 2000 WL 761881 (6th Cir. May 30, 2000), a panel of this court affirmed the application of the "sophisticated means" enhancement to the offense level of defendant, stating:

> [The defendant] prepared the 1041 forms to indicate that [a corporation's] income was distributed offshore to an entity that did not exist. He attached Schedule C forms that should have been attached to the 1040 forms to the 1041 forms. He was a signatory on one of the trust

---

[4]Explanatory notes to the amendment explain that the language of the enhancement for "sophisticated means" in the 1995 edition of the Sentencing Guidelines is "essentially equivalent" to the language of the enhancement for "sophisticated enhancement." U.S.S.G. Supplement to Appendix C, Amendment 577 at 6 (1998).

in permitting the Stewarts to use his signature stamp, securing property for the Stewarts, and creating a bogus mortgage were essential to the operation of the conspiracy. Therefore, we find that Sabino's actions as trustee were indispensable to the conspiracy and the district court's reduction in his offense level was clearly erroneous.

### 2. *Sophisticated Concealment Enhancement: the Stewarts and Sabino*

The government argues that the district court should have increased the defendants' offense levels for utilizing sophisticated means to conceal the conspiracy under U.S.S.G. § 2T1.1. On appeal, the district court's determination concerning the applicability of this guideline section is reviewed for clear error. *United States v. Kraig*, 99 F.3d 1361, 1371 (6th Cir. 1996). However, the application of the guideline to a particular set of facts is reviewed *de novo*. *See United States v. Pierce*, 17 F.3d 146, 151 (6th Cir. 1994).

The 1998 edition of the Sentencing Guidelines states: "[i]f the offense involved sophisticated concealment, increase by 2 levels." U.S.S.G. § 2T1.1(b)(2).[3] Application note 4 states: "'sophisticated concealment' means especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts ordinarily indicates sophisticated concealment." U.S.S.G. § 2T1.1 cmt. 4.

---

[3]The pre-sentence report and the government's brief, however, refer to sophisticated *means*, and the government's brief cites to the 1995 edition of the Guidelines manual in discussing this issue. The Sentencing Guidelines "in effect on the date that the defendant is sentenced" are applied. U.S.S.G. § 1B1.11. Therefore, the 1998 edition of the Sentencing Guidelines is applicable.

1487 (6th Cir. 1991) (citing *United States v. Sullivan*, 274 U.S. 259, 260 (1927)).

The requirement of filing tax returns was not directed at the Stewarts because they were suspected of criminal activities. Further, the Stewarts did not file any returns and thus did not lodge any particular objections to filing the requisite information. Therefore, they are not protected by the Fifth Amendment privilege. The Stewarts argue, however, that any tax return filed after they were read their *Miranda* rights in 1992 by an IRS investigator would have constituted potential evidence for a criminal prosecution because the IRS had placed a "freeze code" on their accounts. A "freeze code," however, constitutes nothing more than an internal act of the IRS. *See In re Burrow*, 36 B.R. 960, 961 (Bankr. D. Ut. 1984) ("When the IRS received notice of debtors' filing, it placed what it calls a 'freeze code' or 'bankruptcy code' on debtors' account in the IRS computer system. A freeze code prevents the filing of tax liens, the assessment of taxes, the setoff of tax overpayments against tax liabilities, and the issuance of tax refunds.") Therefore, the district court did not err in rejecting the Stewarts' claim.[2]

---

[2]The Stewarts rely upon two Ninth Circuit cases to support their argument that actually contradict their position. In *United States v. Troescher*, 99 F.3d 933 (9th Cir. 1996), the court declined to address the claim: we "need not consider how or in what manner the Fifth Amendment may be invoked as a defense to a prosecution for failure to file tax returns." *Id.* at 935 n. 3 (citing *Sullivan*, 274 U.S. at 263-64; *United States v. Rendahl*, 746 F.2d 553, 556 (9th Cir. 1984)). In *Rendahl*, the court explicitly countered the Stewarts' argument in the following discussion:

> In *United States v. Carlson*, 617 F.2d 518 (9th Cir. 1980), the defendant had filed a false W-4 form claiming ninety-nine withholding exemptions, and then did not file a return. As defense to a charge of willful failure to file a return, Carlson claimed that filing a return would have incriminated him for having previously filed the false withholding form. The court found that Carlson would indeed have incriminated himself had he filed a return. 617 F.2d at 520. Nevertheless, it concluded

### C. *Summary Witness Testimony*

#### 1.

The government called Emily Franxman (Franxman), an IRS employee, to testify as a summary witness. The Stewarts argue that Franxman offered impermissible credibility determinations and legal conclusions and that it was plain error for the district court to admit Franxman's testimony as evidence. Therefore, the Stewarts argue that this court should remand the case to the district court with instructions to strike Franxman's testimony and dismiss the case. A district court's evidentiary rulings are reviewed for an abuse of discretion. *See Morales v. American Honda Motor Company, Inc.*, 151 F.3d 500, 515 (6th Cir. 1998).

Testimony summarizing evidence is admissible in income tax prosecutions. *Sturman*, 951 F.2d at 1480 (citing *United States v. Lattus*, 512 F.2d 352, 353 (6th Cir. 1975)). Such testimony is admissible in a criminal trial "when the judge charges the jury as to all the elements necessary for conviction, where the summary is intended to aid the jury in

---

that Carlson had not validly invoked the privilege. The court noted that in cases where the privilege is invoked to avoid incrimination for past tax crimes, the privilege against self-incrimination comes in conflict with the "need for public revenue collection by a process necessarily reliant on self-reporting." 617 F.2d at 521. In such cases, the court must balance these two interests. In *Carlson*, the court concluded that the public interest in raising revenue outweighed Carlson's Fifth Amendment interests. Two factors were significant in the decision. First, Carlson had used the privilege as part of a scheme to avoid payment of taxes--his submission of a false W-4 form was concealed by his failure to file a return, which also enabled him to conceal his overall tax liabilities. Second, the requirement of filing an annual tax return is directed at revenue collection, not criminal prosecution: the questions in the return are neutral and directed at the public at large.

*Redahl*, 746 F.2d at 555 (citing *Sullivan*, 274 U.S. at 263-64).

trial testimony showed that Sabino gave a brief presentation at a PCS meeting attended by Mrs. Stewart. There was substantial evidence for the jury to conclude that Sabino willfully participated in the conspiracy.

### G. *Sentencing Determinations*

#### 1. *Minor Role Reduction: Sabino*

The government argues that the district court erred in granting Sabino a reduction in his offense level for serving as a minor participant in the conspiracy. The Sentencing Guidelines provide that a sentencing court should decrease an offense level by 2 levels if a defendant is a minor participant in a criminal offense. U.S.S.G. § 3B1.2 (1998). The district court's reduction of an offense level under this guideline is reviewed for clear error. *See United States v. Latouf*, 132 F.3d 320, 332 (6th Cir. 1997) (citing *United States v. Miller*, 56 F.3d 719, 720 (6th Cir. 1995)). The defendant bears the burden of proof in establishing his entitlement to the reduction. *See id*. "'An adjustment is not appropriate in the absence of a finding that the defendant was 'substantially less culpable than the average participant' in the criminal enterprise.'" *Id*. (quoting *Miller*, 56 F.3d at 720). "A defendant whose participation is indispensable to the carrying out of the plan is not entitled to a role reduction." *Id*. (citation omitted).

The government lists several acts of Sabino that it submits comprised more than a minor role in the conspiracy, specifically his conduct in serving as a trustee for several of the trusts; signing or having his signature stamped on a contract for the purchase of property on behalf of the Stewarts; having his signature stamped on a trust banking account that benefitted the Stewarts; and participating in the placement of a bogus mortgage on the Stewarts' residence. Sabino argues that he contributed no special knowledge or skills that were essential to the completion of the conspiracy. However, Sabino's willful conduct as a trustee of the trusts,

alleged; and (4) . . . such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged."

*Kraig*, 99 F.3d at 1368 (citing *United States v. Sturman*, 951 F.2d 1466, 1474 (6th Cir. 1991)). Although § 371 is broadly construed, "[i]t is fundamental that a conviction for conspiracy under 18 U.S.C. § 371 cannot be sustained unless there is 'proof of an agreement to commit an offense against the United States.'" *United States v. Collins*, 78 F.3d 1021, 1037 (6th Cir. 1996) (quoting *Ingram v. United States*, 360 U.S. 672, 677-78 (1959)). "[T]he government need not prove a formal agreement--a tacit or mutual understanding to engage in a common plan is sufficient." *Id*. (citing *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir.1989)). Further, "[t]he agreement may be inferred from the acts done in furtherance of the conspiracy." *United States v. Hitow*, 889 F.2d 1573, 1577 (6th Cir. 1989). Once the government proves that a conspiracy existed, the defendant's "connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great." *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir. 1988).

The government must show that the conspirators intended to impair the functions of the IRS. While the government need not "prove that the conspirators were aware of the criminality of their objective," it must "show that they knew of the liability for federal taxes." *Collins*, 78 F.3d at 1037.

There was ample evidence at trial to sustain the conviction of Sabino for conspiracy. The Stewarts were the primary players in the tax evasion scheme. Yet Sabino served as trustee for some of the trusts and in his capacity facilitated transfers of the Stewarts' interests to the trusts. His signature authorized the payment of the Stewarts' living expenses and mortgages, and he acted as the "manager" for Danco although he did not have any substantive responsibilities. Sabino also testified falsely to the grand jury concerning various transactions conducted on behalf of the trusts. In addition,

organizing proof, and where the summary is not inflammatory or prejudicially worded." *Id*.

While a summary witness may give an opinion that "events assumed in [a] question would trigger tax liability[,]" or "whether particular payments under assumed circumstances would be taxable," he or she may not give a legal opinion that necessarily determines the guilt of a defendant or instructs the jury on controlling legal principles. *United States v. Monus*, 128 F.3d 376, 386 (6th Cir. 1997). Therefore, in a tax case, the summary witness is allowed to "summarize and analyze the facts indicating willful tax evasion so long as [she does] not 'directly embrace the ultimate question of whether [the defendants] did in fact intend to evade income taxes.'" *United States v. Moore*, 997 F.2d 55, 59 (5th Cir. 1993) (quoting *United States v. Dotson*, 817 F.2d 1127, 1132 (5th Cir.1987).

The testimony of a summary witness "should be accompanied by a limiting instruction which informs the jury of the summary's purpose and that [the summary itself] does not constitute evidence." *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991). In *Paulino*, a panel of this court held the testimony of a non-expert summary witness admissible under FED. R. EVID. 611(a) because the district court gave a limiting instruction and the defense had a full opportunity to cross-examine the witness. *Id*.

The district court instructed to the jury regarding Franxman's testimony as follows:

This is an opinion witness. Whether she will be able to give an opinion on a certain subject will depend upon what the subject is. She is not an expert. There are no experts in this court. She is an opinion witness. And that's all she will be able to help us with.

* * *

There is a legal definition of net worth that the Court will give you. However, at this time the witness is giving the basis of her opinion for you to analyze, and for that purpose she has stated what she believes net worth to be. The definition, the legal definition of net worth will be given to you at a subsequent time in the proceedings. . . . [T]here will be certain summaries testified to in the next several hours. These summaries were prepared by a witness and are submitted to you for the purpose of explaining facts disclosed by testimony and other documents which are legal evidence in the case. Such summaries are not in and of themselves proof of any facts. If such summaries do not correctly reflect facts or figures shown by the legal evidence in the case, then you may disregard them entirely. They are simply to assist you in summarizing what the witness believes the evidence to be.

These instructions included the appropriate limitations by the court and did not present any improper direction. Further, use of Franxman as a summary witness was not error because the defendants cross-examined her extensively. Franxman analyzed the multitude of documents and testimony admitted into evidence and properly testified as to the government's calculation of tax due from the Stewarts. *See United States v. Mohney*, 949 F.2d 1397, 1406 (6th Cir. 1991). She did not render an opinion concerning the guilt of the defendants; she simply calculated the taxes that the Stewarts owed based on the evidence at trial.

2.

The Stewarts also objected to parts of Franxman's testimony. First, the Stewarts argue that she improperly treated a promissory note from Danco to Mrs. Stewart's mother as a personal asset of Mrs. Stewart, and second, she assigned ownership to the Stewarts of property titled in other persons' names. Franxman, however, merely accorded these assets the treatment that the evidence demonstrated they

government improperly included Danco's $50,000 loan to Mrs. Stewart's mother as an asset, but, as mentioned above, one may properly disregard this argument because evidence revealed that the mother repaid the loan to Mrs. Stewart rather than to Danco. Accordingly, the Stewarts' arguments regarding net worth are meritless.

F. *Insufficient Evidence of Conspiracy Count*

Sabino argues that his conviction should be reversed because there was insufficient evidence to find him guilty on the conspiracy count. In particular, Sabino argues that there was no evidence that he perpetrated any deceitful or dishonest acts, that he conspired with other persons who committed deceitful or dishonest acts, or that he had knowledge of tax laws pertaining to the trusts for which he was trustee. "Evidence is sufficient to uphold a jury conviction if after viewing the evidence in the light most favorable to the government and drawing all inferences in the government's favor, a reasonable juror could find that each element of the offense has been established beyond a reasonable doubt." *United States v. Kraig*, 99 F.3d 1361, 1368 (6th Cir. 1996) (citing *United States v. Taylor*, 13 F.3d 986, 991 (6th Cir. 1994)).

Sabino was convicted of conspiring to defraud the IRS under 18 U.S.C. § 371. According to § 371, "[i]f two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined . . . ." 18 U.S.C. § 371. The elements of a § 371 conspiracy are:

"(1) the conspiracy described in the indictment was wilfully formed, and was existing at or about the time alleged; (2) . . . the accused willfully became a member of the conspiracy; (3) . . . one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place

accounting for cash in the opening net worth computation." *Giacalone*, 574 F.2d at 333. Therefore, the establishment of requisite proof permits the "use of dashes" to represent "cash" for contested years; such symbolic denominations "[do] not invalidate the net worth statement." *Id*. at 332.

Franxman presented the Stewarts' cash assets as a dash, and thus constant, for the contested years. She relied upon various factors to conclude that the Stewarts did not have a cash hoard at the close of 1990, including: 1) evidence of loans of $15,000, $35,000, and $30,000, in 1989, 1990, and 1991, respectively, that suggest the lack of a cash hoard; 2) evidence that checks written on personal accounts did not reveal the purchase of any income-producing assets or investments; 3) and the lack of evidence to support that the Stewarts had a history of engaging in large cash transactions. On cross-examination, Mr. Stewart's attorney suggested the existence of cash items totaling $62,485, but the Stewarts acknowledged in their brief on appeal that they could not provide any leads for the items. In any event, Franxman properly disposed of these suggestions.

The Stewarts also claimed additional errors in the government's net worth calculation, specifically directing this court to several missed assets: $60,000 in household furniture; the $10,000 value of a $600,000 life insurance policy; and $22,566 in loans the Stewarts allegedly made to Danco. As set forth by the government, though, there was no evidence that the Stewarts disposed of the furniture during the contested years, so its value remained constant during the period. The Stewarts claim that the furniture constituted an asset because insurance proceeds covered destruction of the furniture during a fire, but the evidence showed that proceeds from the insurance settlement check primarily went to a contractor to clean smoke damage, not to buy new furniture. The Stewarts did not elicit any evidence that they disposed of the life insurance policy or borrowed against it, and they did not demonstrate that their loans to Danco were repaid or became worthless. The Stewarts also argued that the

deserved. With respect to the promissory note, trial testimony showed that Mrs. Stewart's mother repaid the loan to Mrs. Stewart rather than Danco. Likewise, the evidence supported Franxman's statement, for tax calculation purposes, that the Stewarts truly owned assets titled in the trusts and other persons.

Finally, the Stewarts also argue that Franxman ignored evidence that, as a matter of Ohio corporate law, Danco had been dissolved in 1992. Franxman partially relied upon Danco transactions, made under the auspices of the trusts, to determine Danco's tax liability. Essentially, the Stewarts contend that this testimony was improper because Danco did not exist as a matter of Ohio state law.

A trust having the attributes of a corporation will be treated for federal income tax purposes as an association and thus cognizable as a taxable entity. "The fact that under state law . . . organizations are not legal entities" is not controlling in determining whether they constituted an association, taxable as a corporation. *Commissioner of Internal Revenue v. Fortney Oil Co.*, 125 F.2d 995, 998 (6th Cir. 1942) (citing *Burk-Waggoner Oil Ass'n v. Hopkins*, 269 U.S. 110, 114 (1925)). "The core test of corporate existence for purposes of federal income taxation is always a matter of federal law." *United States v. McDonald & Eide, Inc.*, 865 F.2d 73, 76 (3rd Cir. 1989). The Stewarts' contentions regarding the treatment of Danco are meritless. The existence of Danco as an association taxable as a corporation for federal tax purposes did not depend upon its status under Ohio law.

### D. *Jury Instructions*

In their fourth assignment of error, the Stewarts argue that the district court improperly instructed the jury by failing to include the Stewart's proffered instruction that Danco was dissolved and by administering a confusing instruction regarding opinion witnesses. The Stewarts argue that the district court's refusal to give their proffered instruction and

the overall confusion of the jury instructions constituted reversible error. "[The court] review[s] jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). A judgment will be reversed "based upon an improper jury instruction 'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'" *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001).

1.

The Stewarts argue that the district court improperly refused to instruct the jury that Danco was dissolved as a matter of law. The Stewarts proffered the following instruction and its rationale to the district court: "[A]s a matter of law that the corporation was dissolved. Because corporations are created by -- as they're fictitious entities created by the state and ultimately dissolved by the state and we sure have those dissolution papers in the record without any indication of anything that would render those dissolution papers invalid."

As stated in *Williams*, "[a] . . . refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." 952 F.2d at 1512. The Stewarts' proffered instruction was wrong. Whether the trusts should be taxed as a corporation was not contingent on whether Danco was dissolved under Ohio law. Rather, it was a question of fact whether Danco and the relevant trusts should be treated as a corporation for tax purposes. The proffered instruction erroneously stated that this issue was resolved as a matter of Ohio law.

courts must closely scrutinize its use." *Holland*, 348 U.S. at 125. Thus, opening net worth must be established with "reasonable certainty." *Id.* at 132. "As an added measure of protection the government is required to demonstrate that it has investigated the existence of sources of net worth other than unreported taxable income." *Giacalone*, 574 F.2d at 332. Failure to investigate leads furnished by the taxpayer may result in "serious injustice," *Holland*, 348 U.S. at 135, and thus the "cogency of [the government's] proof depends upon its effective negation of reasonable explanations by the taxpayer inconsistent with guilt." *Id.* "However, where the government proves a source of taxable income, it need not negate all the possible nontaxable sources of the alleged net worth increases, such as gifts, loans, and inheritances. Proof of a source of taxable income carries with it the negation of untaxable income." *United States v. Bencs*, 28 F.3d 555, 563 (6th Cir. 1994).

The Stewarts argue that the government improperly calculated their net worth because it failed to treat the assets of Danco as those of a sole proprietorship. The discussion above regarding Danco's status as a dissolved corporation, particularly with respect to federal tax law, disposes of this argument.

Next, the Stewarts argue that the government failed to establish opening cash on hand with reasonable certainty because it failed to investigate leads provided by them. "A defense often asserted in net worth cases is that the government's opening net worth is not accurate because of substantial cash or assets on hand at the starting point." *Bencs*, 28 F.3d at 563. The existence of a cash hoard may be refuted, however, by "[e]vidence which carefully traces the financial history of a defendant and discloses expenditures in excess of reported resources in the period immediately preceding the indictment years." *Giacalone*, 574 F.2d at 332. Furthermore, the "recognition of a cash bankroll treated as a constant, together with proof which would support a finding that no significant cash hoard existed, [is] a sufficient

Therefore, because the sum of the district court's instructions set forth the requisite guidance to the jury, we decline to conclude that the instructions as a whole were "confusing, misleading, or prejudicial." *Beaty*, 245 F.3d at 621.

### E. *Net Worth Calculation*

In their sixth assignment of error, the Stewarts contend that the prosecution's calculation of their net worth during the contested years was erroneous.

Title 26 U.S.C. § 7201 provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall . . . be guilty of a felony . . . ." "There are two methods of proof in a tax case. In the 'direct' or 'specific item' method, specific items are demonstrated as the source of unreported income. In the 'indirect' method, the defendant's finances are reconstructed via circumstantial evidence including (1) net worth analysis; (2) bank deposits; and (3) cash expenditures in excess of reported income." *United States v. Hart*, 70 F.3d 854, 860 n. 8 (6th Cir. 1995). Under the net worth method, the government attempts to establish an "opening net worth," or rather total net value (excess of assets at cost over liabilities) of the taxpayer's wealth at the beginning of a given year. Then, it determines increases in the taxpayer's net worth and adds nondeductible expenditures incurred during the year. The difference between the adjusted net values at the beginning and end of the year is treated as the taxable income received during the year. The government must rule out the existence of nontaxable funds as the source of expenditures or increases in net worth. *See Holland v. United States*, 348 U.S. 121, 125 (1954); *United States v. Giacalone*, 574 F.2d 328, 330 (6th Cir. 1978).

In "indirect method" cases, "the evidence of guilt is largely circumstantial, and the net worth method is, at best, only an approximation." *Giacalone*, 574 F.2d at 332. The net worth method is "so fraught with danger for the innocent that the

### 2.

The Stewarts' second contention, that the district court delivered confusing instructions regarding opinion witnesses, involves the district court's instruction concerning Franxman. The district court instructed the jury as follows:

*OPINION WITNESS AND HYPOTHETICAL QUESTION*

In this case, you have heard the testimony of witnesses who have rendered opinions. Persons who have experience in any art, science, profession, or calling, may state their opinions in a matter which is relevant to the case. They may also state the reasons for their opinion.

You should consider each opinion received in this case separately and give it such weight as you think it deserves. You may consider the education, training, and experience of the opinion witnesses when determining the weight of their opinions. You may reject the opinion in whole or in part if you conclude the reasons given in support of the opinions are unsound.

Questions have been asked in which opinion witnesses were permitted to assume that certain facts were true and to give their opinions based on those assumptions. You must determine whether the assumed facts, upon which these witnesses base their opinions are true. If any assumed fact was not established by the government by legal evidence beyond a reasonable doubt, you must determine the effect of that fact not being established upon the value of the opinion of the witness.

You may consider the following questions in deciding whether to believe these witnesses and how much to rely on their testimony:

1. What facts did the witness assume? Remember that you must decide which facts are true based upon the legal evidence in this case.

2. Does the opinion of the witness take into account most or all of the important facts that you decided are true?
3. Does the opinion of the witness adequately explain the important facts that you decided are true?
4. Does the opinion of the witness rely on facts that you decided are false?

Your answers to these questions may suggest reasons to rely on or reject the opinion of the witness.

As with other witnesses, however, you must decide what weight should be given the testimony of each opinion witness. In determining its weight, you may take into consideration the witness's knowledge, experience, education, truthfulness and familiarity with the facts of the case as well as other means of testing credibility and determining the weight to be given to the testimony. In short, you may use all those tests you ordinarily use in everyday life to determine whether an individual is well-informed regarding the matters he or she has talked about.

First, the Stewarts contend that the instruction gave weight to Franxman's testimony as to the legal status of Danco. We disagree, especially since the district court instructed the jury as to the standards for delineating associations taxable as corporations.

The Stewarts argue, somewhat confusingly, that the district court's instruction bewildered the jury because it suggested that the prosecution had a duty to establish beyond a reasonable doubt assumed facts that the defendants had presented in cross-examination. In this argument, the Stewarts referred to the portion of the instruction above that instructs the jury to determine whether assumed facts relied upon by opinion witnesses are true. The Stewarts, however, misinterpret the district court's instruction. Apparently, the

district court's reference to "assumed facts" corresponded to the trial evidence relied upon by Franxman in her testimony. Surely, the evidence relied upon by Franxman constituted "assumed facts" because the case had not been submitted to the jury at that juncture. Thus, the prosecution still had the burden of establishing the existence of the "assumed facts" although Franxman relied upon them for her tax calculations.

Finally, the Stewarts argued that the instruction allowed the jury to judge the credibility of Franxman on the same standards as an expert witness. The district court's instruction on "opinion witnesses" largely resembles the Sixth Circuit's model instruction on expert witnesses:

(1) You have the testimony of _____, an expert witness. An expert witness has special knowledge or experience that allows the witness to give an opinion.
(2) You do not have to accept an expert's opinion. In deciding how much weight to give it, you should consider the witness's qualifications and how he reached his conclusions.
(3) Remember that you alone decide how much of a witness's testimony to believe, and how much weight it deserves.

Sixth Circuit Instruction 7.03 Pattern Criminal Jury Instructions, Sixth Circuit District Judges Association (1991).

The Stewarts did not object to the instruction. Therefore, any error is reviewed under the plain error doctrine. *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988) Although the district court should have given an instruction that opinion testimony was to be judged like any other testimony, notwithstanding an opinion witness's education or experience, failure to do so did not prejudice the defendants and thus did not rise to the level of plain error given that the defendants could have effectively argued to the jury that they did not have to believe the testimony at issue. *See United States v. Mendoza*, 244 F.3d 1037, 1047-48 (9th Cir. 2001).